### Maria H. TIJERINA, Appellant,

v.

### Honorable Harry N. WALTERS, Administrator of Veterans' Affairs, et al.

### Lorenzo Wilson TIJERINA, Appellant,

v.

### Honorable Harry N. WALTERS, Administrator of Veterans' Affairs, et al.

### Nos. 85–6240, 85–6241.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1986.

Decided June 30, 1987.

Before MIKVA and BUCKLEY, Circuit Judges, and ROBINSON,* Chief Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

These actions under the Privacy Act, the Freedom of Information Act (FOIA), and the United States Constitution grow out of a July 1982 incident in which a Deputy Inspector General of the Veterans Administration (VA) wrote an unsolicited letter to the Texas Bar Examiners detailing allegations that one of the appellants had falsified information submitted in support of a loan application. The Examiners later wrote back to request additional details, which the VA also provided. As a result of the disclosures, appellant Lorenzo Tijerina eventually was found morally unfit to take the Texas bar examination. Mr. Tijerina and his wife, Maria Tijerina, brought this action alleging that the VA's two disclosures resulted in violations of the Tijerinas' rights under the Privacy Act and the Constitution. Appellants also alleged that the VA failed to respond properly to their requests for information under FOIA. The district court, on cross-motions for summary judgment, granted the government's motion and dismissed appellants' claims. We reverse the order of summary judgment as to Mr. Tijerina's Privacy Act claims arising out of the July 1982 disclosure, and affirm as to all other claims.

I. BACKGROUND

In 1980 Maria Tijerina, an Army nurse, and her husband, Lorenzo, at the time a law student at Howard University, applied for a Veterans Administration Home Loan Guaranty. Mr. Tijerina indicated on the application that he was employed by a Mr. Issac Barfield. The mortgage company sent a verification-of-employment form to the address that Mr. Tijerina gave for Mr. Barfield and received a response, purport-

Lorenzo W. Tijerina, pro se, with whom Maria H. Tijerina, was on brief, pro se, for appellants.

Rebecca L. Ross, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellees.

* Of the United States District Court for the District of Columbia, sitting by designation pursu-

ant to 28 U.S.C. § 292(a).

ing to be from Mr. Barfield, indicating that Mr. Tijerina was in his employ.

Some time after the loan was executed, the VA conducted a random audit of the transaction. In the course of the audit, the agency contacted Mr. Barfield, who denied having completed the verification-of-employment form. The matter was referred to the VA's Office of Inspector General (OIG), which investigated the discrepancy and concluded that Mr. Tijerina had authored the form. The OIG then turned the case over to the office of the United States Attorney. That office declined to prosecute the Tijerinas, for reasons which are the subject of some dispute: appellants contend it was for lack of evidence, while the government maintains it was because the Tijerinas' payments were current and the government had suffered no loss.

During its investigation of the case, the OIG learned that Mr. Tijerina intended to take the Texas bar examination some time in the future and that he already had taken the District of Columbia bar examination. On July 19, 1982, Morris Silverstein, a Deputy Inspector General, wrote an unsolicited letter to the Texas Board of Law Examiners and the Committee on Admissions of the District of Columbia Court of Appeals. Mr. Silverstein told the Bar officials that the OIG had recently completed an investigation into whether Mr. Tijerina had falsified a document in connection with a VA guaranteed home loan. The letter stated that although the U.S. Attorney's office declined to prosecute "due to no established loss to the government," Mr. Silverstein's office had concluded that Mr. Tijerina had falsified the form. The letter then concluded:

> During the course of our investigation, it came to our attention that Mr. Tijerina recently graduated from Howard University Law School and may have plans to practice law in Texas. You are therefore being provided with this information for whatever use you deem appropriate. Should you have any questions regarding this matter, do not hesitate to contact this office. Otherwise, no response to this letter is necessary.

Appendix 47. The letter did not mention Maria Tijerina, although it did include a reference number to a VA file that contained information about both appellants.

Mr. Tijerina applied to take the Texas bar examination the following year. On July 13, 1983, the Texas Board of Law Examiners wrote the OIG requesting all information supporting the accusations in Mr. Silverstein's previous letter. Attached to the request was Mr. Tijerina's boilerplate consent authorizing governmental agencies to release information pertaining to him to the Bar Examiners. The OIG responded on July 20 by sending a full copy of the office's investigative report on Mr. Tijerina. The report included biographical information about Mrs. Tijerina as well as joint information that pertained to both appellants, including the couple's assets and liabilities. Neither Mr. nor Mrs. Tijerina was notified that the file had been released.

Three months later, the Texas Board of Law Examiners notified Mr. Tijerina that it had scheduled a hearing to consider the allegation that Mr. Tijerina had obtained a VA guaranteed home loan by means of fraud. The hearing took place on November 22, 1983, and Mr. Tijerina was found morally unfit to sit for the bar examination.

Mr. Tijerina shortly thereafter, on December 25, 1983, wrote the OIG to request his entire file, citing FOIA and the Privacy Act. There was some delay in the agency's response, occasioned in part by Mr. Tijerina's delivery of the letter to the VA's Washington regional office rather than the OIG and in part by the agency's failure to address the request, once it received it, within the ten-day time limit prescribed by FOIA. On January 23, 1984, the Washington office of the VA wrote Mr. Tijerina that it was forwarding his FOIA request to the OIG, but that it had a copy of Mrs. Tijerina's loan file, which it could release to him with his wife's consent. Mr. Tijerina filed the necessary consent, and the VA released the file on February 21. One week later, the OIG responded to Mr. Tijerina's FOIA request by releasing several of the documents in his investigative file and with-

holding others under claims of various FOIA exemptions. Mr. Tijerina filed an administrative appeal, which the VA decided in October 1984, when it agreed to release nearly all of the requested materials. The agency continued to withhold a litigation report about the instant case, which by this time had been filed, and an FBI report, a copy of which the Tijerinas had by then obtained directly from the FBI.

On July 30, 1984, while the administrative appeal was pending, the Tijerinas filed these actions *pro se* in the United States District Court for the District of Columbia, alleging violations of their rights under the Privacy Act, FOIA, and the equal protection and due process clauses of the Constitution. The Tijerinas charged the government with improper disclosure of information about both of them. Mr. Tijerina also alleged that the VA's records were inaccurately maintained in that they indicate that the reason the government did not prosecute him was that it had suffered no loss, rather than that it lacked sufficient evidence. The complaints also charged the government with violating appellants' rights under FOIA by failing promptly to release all requested material. Finally, the Tijerinas alleged violations of their constitutional rights to due process and equal protection, claiming the government intentionally discriminated against them because they are Mexican-Americans.

The parties filed cross-motions for summary judgment in the case, and on October 28, 1985, the district court filed an unpublished Memorandum and Order granting summary judgment to the government. The court dismissed the Privacy Act claims, finding that the VA could exempt itself from civil liability for violations of the Act, and that it had done so with respect to the material in question. The court also found, as an alternative ground for dismissing appellants' Privacy Act claims, that the actions were barred by the statute of limitations. As to the FOIA claims, the court found that Mrs. Tijerina had not made a proper FOIA request and that Mr. Tijerina's claim was moot. Finally, the court held that the appellants had not alleged facts sufficient to support a claim for viola-

tion of their constitutional rights of due process and equal protection.

## II. DISCUSSION

### A. *The Privacy Act Claims*

Among its many other functions, the Privacy Act, 5 U.S.C. § 552a (1982) (the Act), requires governmental agencies to maintain accurate records and safeguards individuals from capricious dissemination of personal information by the government. Subsection (b) of the Act forbids an agency from disclosing information in its files to any person or to another agency without the consent of the individual to whom the information pertains. This broad prohibition is tempered by a dozen exceptions, one of which is relevant to the instant appeal. The exception permits unconsented disclosure for a "Routine Use," which the Act defines as "the use of such record for a purpose which is compatible with the purpose for which [the information] was collected." 5 U.S.C. § 552a(a)(7). In order to disclose information under this exception, the agency first must have established the Routine Use on which it seeks to rely by publishing a notice in the Federal Register detailing "each routine use [for a given system of records], including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D). In this case, the government seeks to rely on two Routine Uses it previously promulgated for the system of records containing Mr. Tijerina's file. These two uses are Routine Use five, which permits disclosure of information relevant to a suspected violation or reasonably imminent violation of law to another agency charged with investigating the violation, and Routine Use three, which permits the VA to respond to an official request of a state agency by disclosing information relevant to that agency's decision whether to issue a license to an individual. *See* 47 Fed.Reg. 24012 (June 2, 1982).

The principal enforcement mechanism for individuals whose rights under the Privacy Act have been violated is the provision for civil remedies contained in subsection (g). That subsection authorizes an aggrieved

individual to bring a civil suit whenever any agency

(C) fails to maintain any record concerning any individual with such accuracy ... and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual.

5 U.S.C. § 552a(g)(1)(C) & (D). Subsection (g) further provides for recovery of actual damages, costs, and attorney's fees for a suit brought under (g)(1)(C) or (D) in which the court determines that the agency acted in a manner that was intentional or willful. 5 U.S.C. § 552a(g)(4).

The Act sets out a statute of limitations for actions brought to enforce any liability created under the Act. It provides that actions may be brought "within two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5). Subsection (g)(5) additionally prescribes a more elastic limitations period for cases in which the agency has materially and willfully misrepresented information that is material to establishing its own liability under the Act; in such instances, "the action may be brought at any time within two years after discovery by the individual of the misrepresentation." *Id.*

Finally, subsection (j) of the Act, entitled "General Exemptions," permits agencies to exempt certain systems of records from some of the constraints established in the Act. Specifically, the subsection provides:

The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of [other provisions of the Act] to exempt any systems of record from any part of [the Act] except [certain enumerated provisions] if the system of records is:

(1) maintained by the Central Intelligence Agency; or

(2) maintained by an agency or component which performs as its principal function any activity pertaining to the enforcement of criminal laws ... and which consists of ... (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual.

5 U.S.C. § 552a(j). Among the many provisions from which subsection (j) specifically forbids the agency from exempting these systems of records is subsection (b), which governs the agency's duties with regard to disclosure of personal information. Subsection (g), which establishes civil remedies for individuals, is not listed among the enumerated provisions of the Act from which the agency's systems of records may not be exempted.

◼ Having canvassed the relevant provisions of the Act, we turn to their application to the instant suit. We concur with the district court's dismissal of Mrs. Tijerina's Privacy Act claims. Mrs. Tijerina's complaint appears to seek damages only for the government's disclosure of personal information about her. However, Mrs. Tijerina does not allege that she suffered any adverse effect from these disclosures, as required by subsection (g)(1)(D) of the Act. The only harm Mrs. Tijerina mentions is having shared the costs occasioned by Mr. Tijerina's defense before the Texas Board of Law Examiners. These costs arose because of the VA's disclosures about her husband. It is an interesting and, so far as we determine, unresolved question whether Mrs. Tijerina could maintain a suit under (g)(1)(D) alleging that the VA's treatment of a third party—i.e. Mr. Tijerina—failed to comply with the Act in such a way as to have an adverse effect on her. It is clear from the Act, however, that Mrs. Tijerina cannot maintain an action under (g)(1)(D) for improper disclosure of information pertaining to her, because she has failed to demonstrate any adverse effect to her from that governmental conduct.

◼ We also agree that Mr. Tijerina cannot maintain a claim for wrongful disclosure arising out of the July, 1983 disclosure

when the OIG sent its file on Mr. Tijerina to the Texas Board of Law Examiners in response to the Board's request. Although the 1983 disclosure may be among the adverse effects caused by the July 1982 letter, the disclosure itself is not actionable under the Act, because Mr. Tijerina consented to it in connection with his application to the Texas Bar, and subsection (b) restricts only disclosures made without the prior written consent of the individual to whom the information pertains. *See* 5 U.S.C. § 552a(b).

There remains, however, Mr. Tijerina's claims arising out of the July 1982 letter from Mr. Silverstein. Tijerina appears to plead two theories of recovery under the Act: one for wrongful disclosure under subsection (g)(1)(D), and one for injurious failure to maintain accurate records under (g)(1)(C). The second claim is based on Tijerina's allegation that the VA's file failed to reflect that the real reason the U.S. Attorney declined to prosecute him was lack of evidence. The government offers four reasons why it is not liable under the Act on either theory. First, it claims that the VA exempted itself from civil liability with regard to the disclosed records. Second, it argues that the claim was barred by the applicable statute of limitations. Third, it urges that the disclosure was authorized under subsection (b)(3) of the Act because it was for a Routine Use. Fourth, it contends that Mr. Tijerina showed neither adverse effect nor intentional or willful violation, which are required under subsection (g) for recovery of money damages. We address each argument in turn.

### 1. *Exemption*

■ Mr. Tijerina's file apparently was contained in a system of records the OIG maintained to investigate irregularities involving VA regulations and federal laws. Relying on subsection (j), the VA purported to exempt this system of records from a long list of provisions under the Act, including subsection (g). *See* 47 Fed.Reg. 24011–13 (June 2, 1982). The district court found that subsection (j) of the Act authorizes an agency to exempt itself from the Act's civil remedies provision. The court went on to find that the VA had fulfilled the statutory rulemaking requirements for exemption and therefore had properly exempted itself from civil liability for wrongful disclosure of the material in Mr. Tijerina's file. We agree that the VA followed the procedural steps listed in subsection (j)(2): the OIG has a principal function of law enforcement, the information in Mr. Tijerina's file was compiled for the purpose of a criminal investigation, and the agency included in the announcement of exemption an explanation of the reasons for its action. *See* 5 U.S.C. §§ 552a(j) & 553. We find, however, that these efforts were to no avail. We conclude that an agency has no power under the Act to exempt itself from the civil liability provisions of subsection (g). The agency's efforts to elude civil liability for violations of statutory duties which cannot be shirked under the Act contravene the language of the Act and the purpose behind the general exemptions provision.

The government's chief argument is that subsection (j) permits the agency to exempt systems of records from any part of the Act except a list of specific provisions, and subsection (g) is "conspicuously absent" from the list. The government contends that this omission demonstrates that Congress intended agencies to be able to elude civil liability for any violation of the Act. It anchors this position in the well-accepted principle of statutory construction that the starting point for interpreting a statute is the language of the statute itself. The government's position, however, is unfaithful to this rule. The language of the Act does not indicate, as the government contends, that an agency, after following APA requirements, may exempt *itself* from all provisions of the Privacy Act. Subsection (j) only permits an agency to exempt a *system of records* from the requirements set out in other provisions of the Act. Subsection (g), the Act's civil remedies provision, does not regulate systems of records. It is a derivative provision directed not towards agencies but towards courts and aggrieved individuals: the subsection provides a grant of jurisdiction and a waiver

of sovereign immunity for suits alleging certain violations under the Act. It simply makes no sense for an agency to use subsection (j) to exempt a system of records from civil liability: records are not subject to civil liability under the Act; the United States is.

In short, an agency can employ subsection (j) in its expertise to adjust certain of its responsibilities under the Act. But liability is not itself among an agency's responsibilities under the Act; it is the result of the agency's failure to meet its duties. One of the agency's duties—and one from which the VA could not exempt itself—is the duty not to make unconsented disclosures of records except under certain circumstances. If the VA violated that requirement in such a way as to have an adverse effect on Mr. Tijerina (and if the government has no available defenses), Congress provided for civil liability to follow as a matter of course.

Besides torturing the language of the Act, the government's interpretation also perverts the purpose behind the Act's general exemptions provision. An examination of subsection (j) against the rest of the Act and its accompanying legislative history demonstrates that the provision is intended principally to permit the government to withhold *access* to certain sensitive information so as not to hamper law enforcement efforts. It specifically is not intended to permit agencies in any way to abridge their responsibilities governing *disclosure:* subsection (j) in fact specifically forbids the agency from exempting records from the Act's many constraints and obligations governing disclosure of personal information, such as subsection (b) (conditions of disclosure), subsections (c)(1) and (2) (accounting of disclosures), and subsection (e)(6) (accuracy of disclosed material). Moreover, the exemptions provision details the kinds of records that may be exempted, and they all relate to law enforcement activities that require a measure of secrecy. As the House Report explained,

> Only records maintained by the Central Intelligence Agency and criminal justice records could be so exempted. Even they would be subject to the require-

ments relating to conditions of disclosure.... The Committee believes that such a broad [exemption] is permissible for these two types of records because they contain particularly sensitive information. C.I.A. files may include the most delicate information regarding national security.... The Committee also wishes to stress that this section is not intended to require the C.I.A. and criminal justice agencies to withhold all their personal records from the individuals to whom they pertain. We urge those agencies to keep open whatever files are presently open and to make available in the future whatever files can be made available without clearly infringing on the ability of the agencies to fulfill their missions.

H.R.Rep. No. 93–1416, 93d Cong., 2d Sess., *reprinted in Legislative History of the Privacy Act of 1974*, at 311–12 (1976).

In fact, the VA itself relied on subsection (j)'s core principle of law enforcement secrecy in explaining its reasons for exempting the system of records containing Mr. Tijerina's file. The agency wrote:

> Reasons for exemptions: The exemption of information and material in this system of records is necessary in order to accomplish the law enforcement functions of the Office of Inspector General, to prevent subjects of investigations from frustrating the investigatory process, to prevent the disclosure of investigative techniques, to fulfill commitments made to protect the confidentiality of sources, to maintain access to sources of information and to avoid endangering these sources and law enforcement personnel.

47 Fed.Reg. 24013. None of the purposes the VA cited is remotely served by allowing the agency to escape civil liability for violations of the disclosure or accuracy requirements of the Act. Rather, the agency's statement of purpose only reaffirms that Congress inserted subsection (j) into the Act in order to permit agencies to shield information whose revelation could impede law enforcement efforts.

We are aware that some other courts have indicated in dicta that agencies may employ subsection (j) to exempt themselves from the Act's civil remedies provision. *See, e.g., Kimberlin v. Dept. of Justice,* 788 F.2d 434, 436 n. 2 (7th Cir.1986); *Ryan v. Dept. of Justice,* 595 F.2d 954, 958 (4th Cir.1979). Having considered the issue at length in a case in which it is squarely presented, we decline to follow that view. The Act's statutory language, framework, and legislative history persuade us that the government is urging a completely anomalous use of the exemption provision that makes the Act a foolishness. The interpretation offered by the government would give agencies license to defang completely the strict limitations on disclosure that Congress intended to impose. We cannot agree that at the same time it forbade agencies to exempt systems of records from disclosure requirements, Congress intended them to be able to elude civil liability at their caprice. Agency exemption from civil liability is not in keeping with the language of the Act, and it serves none of the purposes behind the exemptions provision or the Act as a whole. We therefore hold that a governmental agency cannot employ subsection (j) to exempt itself from subsection (g)'s provision for civil liability for violations of the Act.

### 2. *Statute of Limitations*

■ The district court supplied an alternative ground for dismissing Mr. Tijerina's claims growing out of the July 19, 1982 Silverstein letter. The court found · that those claims were barred by the Act's two-year statute of limitations because Mr. Tijerina filed suit two years and 11 days after Silverstein sent the letter. The court apparently concluded that the two-year period automatically begins to run from the time of the contested disclosure, even if the plaintiff has no reason to know of the government's action. On appeal, the government asserts that this is the law, although it cites no authority for that proposition. The government bases its argument on the second part of the Act's statute of limitations (on which appellants do not rely). This section provides that

"where an agency has materially and willfully misrepresented any information required under [the Act] to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under [the Act], the action may be brought at any time within two years after discovery by the individual of the misrepresentation." 5 U.S.C. § 552a(g)(5). The government contends that this provision makes sense only if Congress intended the normal statutory period to commence at the time of the alleged violation, regardless of whether the potential plaintiff is or should be aware of the agency's action.

We disagree. Although this court has not previously faced the issue of when a cause of action arises for purposes of measuring the statutory limitations period under the Act, other courts that have addressed the question in causes of action similar to the instant case have concluded that "[i]t is necessary ... for plaintiff to know or have reason to know that the adverse action occurred." *Pope v. Bond,* 641 F.Supp. 489, 499–500 (D.D.C.1986) (wrongful disclosure); *see Bergman v. United States,* 751 F.2d 314, 316 (10th Cir. 1984) (failure to maintain accurate records), *cert. denied,* —— U.S. ——, 106 S.Ct. 310, 88 L.Ed.2d 287 (1986). *Accord Diliberti v. USA,* 817 F.2d 1259, (7th Cir.1987). Furthermore, this view—which, as far as we can determine, no court has rejected—best accords with Congress's intent in passing the Act, which is our touchstone in determining when the statute begins to run. *See Burnett v. New York Central R.R. Co.,* 380 U.S. 424, 427, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). The Act seeks to provide a remedy for governmental conduct that by its very nature is frequently difficult to discover. An unauthorized, unconsented-to disclosure such as is alleged in this case, for example, is unlikely to come to the subject's attention until it affects him adversely, if then. Mr. Tijerina in fact contends he did not learn of the OIG's disclosure until October, 1983, when the Texas Board of Law Examiners notified him of its impending hearing into his moral fitness. Because possible violations of the

Act are often not immediately apparent to the aggrieved individual, Congress's desire to provide a civil remedy would be poorly served if the cause of action could arise before the plaintiff even had reason to know of the violation. We therefore join other courts in holding that in a normal Privacy Act claim, the cause of action does not arise and the statute of limitation does not begin to run until the plaintiff knows or should know of the alleged violation. *Cf. United States v. Sams,* 521 F.2d 421, 429 (3d Cir.1975) (statute of limitations may be tolled where plaintiff, in the exercise of reasonable diligence, could not have known of government's allegedly wrongful conduct). In view of this holding, the district court erred in finding that the statutory period had expired in this case, since the evidence indicates that Mr. Tijerina neither knew nor should have known of the July 19 letter by July 30, 1982, two years before this action was filed.

Contrary to the government's suggestion, our holding does not read out of existence the clause providing for a more liberal limitations period in cases of willful misrepresentation of material information. That clause extends the normal limitations period in order to ensure that the government cannot escape liability by purposefully misrepresenting information that could establish it already has violated the Act. *See, Lepkowski v. Dept. of Treasury,* 804 F.2d 1310, 1322 n. 85 (D.C.Cir.1986) (Robinson, J., concurring). In such cases, the Act allows the period to commence upon actual discovery of the misrepresentation, whereas our holding today is that for other actions under the Act, the period begins when the plaintiff knew or should have known of the violation. Our holding thus in no way affects the special treatment Congress provided for the particularly egregious cases of government misconduct singled out in the Act's statute of limitations.

### 3. *Routine Uses*

■ Having articulated two distinct bases for granting summary judgment, the district court did not address the government's argument that the Silverstein letter did not violate subsection (b) of the Act, which governs conditions of disclosure, be-

cause the disclosure was for a "Routine Use." We find, however, that the Routine Uses that the government cites in this case are unavailing. The government first contends that the Silverstein letter was authorized under Routine Use five, which the VA promulgated to permit disclosure of information relevant to a suspected violation or reasonably imminent violation of law to another agency charged with investigating the violation. *See* 47 Fed.Reg. 24012 (June 2, 1982). The government argues this Routine Use applies to the Silverstein letter because that disclosure helped the Texas Board of Law Examiners investigate a possible violation of the Texas statute that forbids persons from sitting for the bar unless they have demonstrated good moral character. It is not clear, however, that Mr. Tijerina would have violated the Texas statute by taking the bar examination. Even if Mr. Tijerina would have violated Texas law by sitting for the bar examination, the violation was not conceivably "reasonably imminent" at the time of the Silverstein letter; the OIG knew only that Mr. Tijerina might take the Texas bar examination at some time in the future. Routine Use five by its terms does not justify disclosure on the basis of such remote speculation.

■ The government also attempts to rely on Routine Use three, which permits the VA to respond to an official request of a state agency by disclosing information relevant to that agency's decision whether to issue a license to an individual. *Id.* Reliance on this Routine Use overlooks one of the most notable aspects of the Silverstein letter: it was unsolicited. The Texas Board of Law Examiners had not requested any information whatsoever. Routine Use three, therefore, like Routine Use five, does not provide a basis for upholding the district court's grant of summary judgment on Mr. Tijerina's wrongful disclosure claim.

### 4. *Adverse Effect and Willful or Intentional Violation*

■ The Act provides a civil remedy when an agency's failure to comply with one of the Act's provisions has an adverse effect on an individual. 5 U.S.C. § 552a(g)(1)(D). The government claims

that Mr. Tijerina failed to show that the VA's allegedly unlawful disclosure had an adverse effect on him. According to the government, the real reason Mr. Tijerina was not permitted to take the Texas bar examination was that he had attempted to defraud the government by filing a falsified loan application form, not that the OIG had disclosed this information to the Texas Board. This argument is vacuous. It could be used to justify indiscriminate disclosure of any incriminating information, which Congress clearly did not intend.

The Act further provides for damages, costs, and fees against the government when the court determines that the agency acted in a manner which was intentional or willful. *Id.* The government contends that to meet this standard, the plaintiff must show that the agency official acted with the actual intent to violate the Privacy Act. The government therefore concludes that Mr. Silverstein's affidavit stating he did not believe he was violating the Act in sending the July 1982 letter disposes of appellant's damages claim. This position misinterprets the intentional-or-willful standard. The standard does not require the official to set out purposely to violate the Act; if the standard were so viewed, damages would be a rare remedy indeed. Rather, as a staff report explaining the compromises between the Senate and House versions of the Act pointed out, the standard "is viewed as only somewhat greater than gross negligence." *See Analysis of House and Senate Compromise Amendments to the Federal Privacy Act,* reprinted in 120 *Cong.Rec.* 40405–06 (1974). Inasmuch as there is certainly a genuine issue of material fact as to whether Silverstein acted with something greater than gross negligence in sending out the unsolicited letter, the issue cannot be disposed of on summary judgment. *United States v. Albright,* 732 F.2d 181 (D.C.Cir. 1984), on which the government places considerable reliance, is not to the contrary. In that case, we specifically recognized that the Act imposes liability where the agency "commit[s] the act without grounds for believing it to be lawful [or] flagrantly disregard[s] others' rights under the Act." *Id.* at 189. Under this articulation of the

standard as well, Mr. Tijerina has raised a genuine issue of material fact sufficient to withstand a summary judgment motion.

### B. *The FOIA Claims*

The district court properly dismissed all claims appellants brought under FOIA. The VA's response may have failed to meet FOIA's mandated standards of promptness, but the agency by now has released all nonexempt materials the Tijerinas seek. The only material appellants have not received is the VA's litigation report about the instant case, which is clearly exempt under FOIA. As we have noted, "however fitful or delayed the release of information under the FOIA may be ... if we are convinced appellees have, however belatedly, released all nonexempt material, we have no further judicial function to perform under the FOIA." *Perry v. Block,* 684 F.2d 121, 125 (D.C.Cir.1982). We are so convinced and therefore find that these claims no longer present a live controversy.

### C. *The Constitutional Claims*

We affirm the district court's dismissal of appellants' claims that the government violated their constitutional rights to due process and equal protection. Appellants presented no evidence of a racially discriminatory intent or purpose to single them out as a racial minority. Their equal protection claim therefore cannot stand. *See Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). As for the due process claim, any injury to reputation accompanying the disclosure of the allegation against Mr. Tijerina was not sufficient to trigger due process protection. *See Paul v. Davis,* 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976). Although the decision of the Texas Board of Law Examiners preventing Mr. Tijerina from taking the bar examination may have worked an alteration of status sufficient to trigger due process protection, *see id.* at 708–09, 96 S.Ct. at 1164, Mr. Tijerina had full notice and opportunity to be heard before that action was taken. Appellants' due process rights therefore were not abridged.

**800**

### III. CONCLUSION

The court need not give lengthy consideration to the reasons for Mr. Silverstein's gratuitous submission to the Texas Board of Law Examiners. Whether he was a frustrated government employee trying to find a substitute sanction for the failed criminal prosecution, or merely a good citizen concerned about the character of would-be Texas lawyers, Mr. Silverstein was not a free agent. The Privacy Act was intended to build constraints around the disclosure of information in government files irrespective of the worthiness of the cause for such disclosure. Under those constraints, appellant Lorenzo Tijerina had the right to proceed to trial to test his claims arising out of the July 1982 letter, and if he prevailed, to receive the civil remedies made available in the Act. We reverse the district court's decision to the contrary.

In all other respects the judgment of the district court is affirmed.

*It is so ordered.*