Elaine MITTLEMAN, Plaintiff,

v.

UNITED STATES TREASURY, James A. Baker, individually and in his official capacity as Secretary; United States Department of Commerce, Malcolm A. Baldridge, individually and in his official capacity as Secretary, James T. King, individually and in his official capacity as Personnel Officer of International Trade Administration; United States Secret Service, John R. Simpson, individually and in his official capacity as Director; United States Office of Personnel Management, Constance Horner, individually and in her official capacity as Director, Protected Source "A" in plaintiff's investigative file, individually and in his official capacity, Protected Source "B" in plaintiff's investigative file, individually and in his official capacity; United States Merit Systems Protection Board, Maria L. Johnson, individually and in her official capacity as Acting Chair, Shigeki J. Sugiyama, individually and in his official capacity as Associate General Counsel of the Office of Special Counsel; Michael A. Driggs, individually and in his official capacity as a staff member of the Chrysler Loan Guarantee Board at the U.S. Treasury; Roger C.

Altman, individually and in his official capacity as Assistant Secretary of the U.S. Treasury; and Anthony L. Conques, individually and in his official capacity as Administrative Officer at the U.S. Treasury, Defendants.

Civ. A. No. 86–1852 SSH.

United States District Court, District of Columbia.

Aug. 29, 1991.

1.

Elaine Mittleman, pro se.

Asst. U.S. Atty. Mark E. Nagle, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

Now before the Court is defendants' motion to dismiss or, in the alternative, for summary judgment. For the reasons set forth below, defendants' motion is granted in part and denied in part.[1]

*Background*

The following facts have been taken from the amended complaint.[2] In May 1980, plaintiff was hired for a GS–13, Schedule A position on the Chrysler Loan Guarantee Board (CLGB) staff at the United States Department of the Treasury (Treasury). As part of her job, plaintiff kept track of the many reports the Chrysler Corporation was required to submit. Almost from the beginning of her employment, plaintiff became concerned that Chrysler was providing the CLGB with overly optimistic financial forecasts. In the summer and fall of 1980, Chrysler's financial situation was worsening, but the company was not submitting all of its required reports. Plaintiff communicated her concerns to several officials within Treasury, but generally received no response. On September 3, 1980, plaintiff met with defendant Roger Altman to discuss her concerns. Altman told her to prepare a memo-

---

1. By separate Order, filed on this date, the Court has granted plaintiff's motion for leave to file an amended complaint. Although defendants' motion was filed in response to plaintiff's original complaint, the Court thought it appropriate to consider the motion in light of the amended complaint. Defendants will, however, be given the opportunity to respond in kind to the remaining claims in the amended complaint, within the time period prescribed by the applicable Rules.

2. Plaintiff is an attorney who is proceeding *pro se* in this case. There are 65 pages in her amended complaint. Thus, although the Court has carefully considered all facts alleged, the Court will not attempt to cite them in their entirety. Similarly, although the facts are simply those alleged by plaintiff, in dealing with them the Court does not repeatedly use the term "alleged" to qualify them.

randum for further discussion. Plaintiff prepared the memorandum, but it was returned to her, only to be used later as an example of plaintiff's doing work she was not supposed to do.

Plaintiff began to communicate her concerns about Chrysler to staff members on Capitol Hill. In November 1980, she met with Representative David Stockman who then reported her concerns to a reporter with the *Detroit News.* Someone from a Congressional office then contacted Altman, who, in turn, asked plaintiff if she had been talking to the press. She replied that she had not. On the evening of November 3, 1980, after returning from Chrysler's offices in Detroit, plaintiff became determined to talk to Altman and went to look for him in his office. Crying from the desperation she was feeling, plaintiff enlisted the aid of a security guard. They went to Altman's office, but he was not there.[3]

In December 1980, under the direction of Altman and other Treasury officials, defendant Michael Driggs told plaintiff that she was to be terminated. He offered her four weeks pay in return for her not taking any Chrysler documents home with her and for returning her government identification card and office key. He also informed her that she would no longer be working on Chrysler matters. Thus, from mid-December through January 30, 1981, plaintiff worked in the Washington Building, a different building than the one in which the CLGB staff was located. This coincided with a period of intense negotiations for Chrysler's third request for funds.

On December 12, 1981, plaintiff expressed her concerns about the monitoring of Chrysler to the Treasury Inspector General (IG). At the IG's request, plaintiff prepared a written analysis of her complaint and again met with the IG on December 15, 1980. In addition, plaintiff approached the Office of Special Counsel (OSC) with her concerns about her termi-

nation. She met with attorneys at the OSC on December 15, 1980, and prepared a written report. In January 1981, OSC informed plaintiff that her complaint was being closed. At her request, the complaint was reopened on January 26, 1981.

By letter dated January 29, 1981, plaintiff requested a copy of the IG report. She received a redacted version on or about February 12, 1981, along with a letter indicating that although the IG report was exempt from the access provisions of the Privacy Act, part of the report was being provided pursuant to the Freedom of Information Act (FOIA). The IG letter described the appeal process under the FOIA, and explained that plaintiff could not amend the report because it was exempt from the amendment provisions of the Privacy Act.

About ten days after being terminated, plaintiff was stopped by the Secret Service when she returned to Treasury to receive her final paycheck. Under orders from the Assistant Secretary, plaintiff was not allowed to enter the building without permission.

In February and March 1981, articles about plaintiff's termination and the IG investigation appeared in *The New York Times, The Wall Street Journal,* the *Detroit News,* and the *Detroit Free Press.* The article in the *Detroit Free Press* stated that although a Treasury spokesman would not permit reporters access to the IG report because of the Privacy Act, the spokesman did say that the report contained information about plaintiff that was "not flattering" and that she had been fired for "unsatisfactory work."

In the Spring of 1981, plaintiff had a job interview with the Office of Management and Budget (OMB). When she told them that she had been fired from Treasury, OMB informed her that she could not be hired. On November 12, 1981, plaintiff received a letter stating that her OSC case was being closed. Defendant Shigeki Sugi-

---

**3.** On November 19, 1980, Robert S. Anderson of the Secret Service wrote a letter describing the incident in Altman's office. Plaintiff believes that the letter contained many inaccuracies and was created to provide evidence that she had been in Altman's office and that she was a security risk.

yama told her that her case had been closed because "nothing happened." When plaintiff replied that she had been fired, Sugiyama responded: "We consider that nothing." Because plaintiff was a Schedule A employee, she had no appeal rights to the Merit Systems Protection Board. Instead, plaintiff expressed her dissatisfaction with OSC to members of Congress.

In April 1982, plaintiff began a series of interviews for a Schedule C position at the Department of Commerce in the International Trade Administration Section (Commerce). She was selected for the job and was told to report for work in November 1982. However, because plaintiff did not have a security clearance, the Office of Personnel Management (OPM) was required to do an investigation into plaintiff's background. On November 18, 1982, plaintiff signed a release form so that the OPM investigator could perform his task. On February 8, 1983, the investigator requested that plaintiff sign a release form specifically for the IG report. She agreed to sign the release, but because she knew that the report was "confusing and incorrect," she stated that she wanted to meet with and explain the report to the person who reviewed it. The investigator stated that it would be no problem because persons who are investigated always have the opportunity to review the file and make comments and corrections. However, plaintiff was never afforded that opportunity. After she ultimately was denied employment with Commerce, plaintiff met with defendant James King to discuss the results of the OPM investigation. King informed her that in order to obtain the OPM report, she would have to submit a written request to OPM. Thus, on May 17, 1983, plaintiff wrote a letter to OPM requesting a copy of the report.

On July 6, 1983, plaintiff received a redacted copy of the OPM report, with Protected Source A and Protected Source B almost completely redacted. It was then that she learned of the accusations against her. OPM indicated that the file would be retained for 15 years and would be available for federal agencies and departments for a variety of purposes, including employment matters. The letter from OPM set forth the procedure for seeking a Privacy Act amendment. In addition, by referral letters, OPM requested that Treasury and the Secret Service send plaintiff the records that originated in those agencies.

By letter dated August 29, 1983, the Treasury IG responded to the OPM referral letter and denied the request, indicating that the IG report previously had been released to plaintiff. However, plaintiff persisted in trying to receive the IG report subsequent to its having been released to OPM and Commerce. By letter dated October 9, 1985, the IG again refused plaintiff's request, citing no FOIA or Privacy Act exemption or rationale. The IG did provide a list of those to whom the report had been distributed, but the list was incomplete. A subsequent request for the IG report was denied on October 9, 1986. After plaintiff called Treasury to explain that she did not have the complete IG report, she was sent another, more heavily redacted copy. Plaintiff attempted to learn whether the IG report was sent with or without redaction to OPM and Commerce, but was unable to do so.

The OPM report contained statements which allegedly were "inaccurate, irrelevant, extremely derogatory and defamatory, and almost ludicrous in their exaggeration." Plaintiff believes that those statements were made intentionally and maliciously, and with knowledge of their falsity.[4] Under cover of a letter dated May 28, 1985, and in response to a FOIA/Privacy Act request by plaintiff, plaintiff received documents from Commerce concerning her personnel and security records. Included in the response was a Commerce letter transmitting the OPM report to King. The letter stated, "In the event adverse action is taken against Subject based on the attached information, she must first be afforded the opportunity to comment

---

**4.** Plaintiff goes on for several pages in her complaint, setting forth specific statements which

she believes meet this description.

thereon." However, plaintiff was not afforded that opportunity.

On December 9, 1986, plaintiff requested an unredacted copy of the OPM report, including the identities of Protected Sources A and B. She also requested that many of the erroneous portions be deleted. Plaintiff then received several follow-up letters which stated that OPM was in the process of reviewing the request and would advise her of the decision as soon as possible. By letter to OPM dated April 7, 1987, plaintiff stated, "I will consider that my request for amendment has been denied, unless I receive a response by close of business on April 10, 1987." Plaintiff received no further response.

On May 21, 1986, columnist Jack Anderson published an article in which he quoted an OSC spokesman about the circumstances of plaintiff's case. This was done without plaintiff's knowledge or permission. Then, in March 1987, John Donahue, one of the authors of *New Deals, the Chrysler Revival and the American System,* told plaintiff that defendant Driggs had told him in an interview that plaintiff had leaked sensitive information about Chrysler's financial situation to the press. Driggs went on to say that his job on the CLGB was made much tougher by the fact that he had to do much of the work by himself (insinuating, the Court assumes, that plaintiff was not much help).

On December 16, 1986, in a letter to plaintiff, the Secret Service informed her that because her file was maintained in a system of records that was exempt from compliance with the contest provisions of the Privacy Act, they were not required to amend her file. Likewise, on December 23, 1986, the Treasury IG informed plaintiff that her file was maintained in a system of records that was exempt from the Privacy Act provisions pertaining to amendment of records. They informed her of her right to appeal the decision. On February 18, 1987, plaintiff's appeal was denied.

On June 23, 1987, Senator David Pryor requested from Treasury a copy of the IG report and information in the IG files relating to plaintiff. On July 8, 1987, Treasury sent the information, including an unredacted copy of the IG report, to Senator Pryor. In July and August 1987, plaintiff was able to review the entire IG report. Prominent in the report were allegations that in November 1980, plaintiff had been found by the Treasury Security Force in Altman's office going through papers on his desk. Also included with the documents given to Senator Pryor was a "Briefing Paper on Inspector General's Investigation Involving the Chrysler Loan Guarantee Board." However, the Briefing Paper stated that the investigation had disclosed that plaintiff had not been found going through Altman's papers. Nevertheless, the accusations remained in the IG report.

Plaintiff commenced this lawsuit on June 30, 1986. Her amended complaint sets forth ten alleged causes of action under the FOIA, the Administrative Procedure Act, 42 U.S.C. § 1985, the Privacy Act, the First, Fourth, Fifth, Sixth, and Ninth Amendments to the Constitution, and common law tort.

### *Discussion*

1. The Freedom of Information Act

■ In Count One of her amended complaint, plaintiff argues that she is entitled to receive an unredacted copy of the IG report, pursuant to the FOIA, 5 U.S.C. § 552(a)(3). However, "[i]t goes without saying that exhaustion of remedies is required in FOIA cases." *Dettmann v. United States Dept. of Justice,* 802 F.2d 1472, 1476 (D.C.Cir.1986); *see* 5 U.S.C. § 552(a)(6)(A)(i), (ii). On February 12, 1981, plaintiff received part of the IG report, pursuant to the FOIA. Although the Treasury officials set forth in writing the appeal process for the FOIA, plaintiff did not administratively appeal the denial of the entire report. Additionally, plaintiff failed to pursue administrative appeals from subsequent denials of her requests. Accordingly, her FOIA claim must be dismissed.

2. The Administrative Procedure Act

■ Plaintiff alleges that various defendants failed to follow their own regulations

and failed to provide plaintiff with a hearing or any other opportunity to rebut the allegations against her in the various Government reports. She argues that such agency actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

Under § 704 of the APA, review is available under the APA only for final agency action "for which there is no other adequate remedy." 5 U.S.C. § 704. It is clear that "§ 704 'does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures.' " *Bowen v. Massachusetts*, 487 U.S. 879, 903, 108 S.Ct. 2722, 2736, 101 L.Ed.2d 749 (1988) (citing Attorney General's Manual on the Administrative Procedure Act 101 (1947)). A careful reading of the amended complaint reveals that plaintiff's APA claim is, in part, simply a restatement of her Privacy Act claims. And, to the extent that it is not, it is a claim relating to a personnel action, for which Congress has provided the Civil Service Reform Act, Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.) (CSRA). In other words, Congress has provided plaintiff with statutory schemes and remedies through which she may seek relief. Thus, her APA claim is properly dismissed under § 704.

**3. 42 U.S.C. § 1985(1), (3)**

▇▇▇ Plaintiff alleges that defendants participated in a continuing conspiracy to harm her reputation and employment opportunities and to deprive her of equal protection of the laws, through gender bias, in violation of 42 U.S.C. § 1985(1), (3). Our Court of Appeals has held that the CSRA is the exclusive remedy for aggrieved federal employees and that, therefore, they are precluded from resorting to § 1985(1). *Spagnola v. Mathis*, 809 F.2d 16, 28–30

(D.C.Cir.1986), *on reh'g en banc*, 859 F.2d 223 (D.C.Cir.1988).[5] Plaintiff might argue that because she is exempt from the remedial provisions of the CSRA, she has no remedy and therefore may bring suit under § 1985. However, the fact that Congress explicitly denied a remedy to Schedule A employees shows an intention to deny them a statutory or constitutional remedy for damages. *See Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C.Cir.1988) (*Spagnola II*); *see also Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (refusing to create a *Bivens* remedy for a First Amendment violation arising out of an employment relationship for which Congress has provided a remedial scheme). The Court must defer to the Congressional scheme for federal employees, and thus, plaintiff's § 1985(1) claim must be dismissed. Furthermore, "Section 1985(3) clearly requires that a plaintiff show 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *Katz v. Klehammer*, 902 F.2d 204, 208 (2d Cir.1990) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)). Plaintiff's complaint fails to set forth even conclusory assertions that would support a finding of class-based animus. Her bare allegation toward the end of her complaint that she was a victim of gender bias clearly is not enough to survive a motion to dismiss.

**4. The Privacy Act**

Plaintiff argues that defendants have violated the Privacy Act, 5 U.S.C. § 552a, in several ways: (1) by failing to maintain accurate records, (2) by preventing plaintiff from learning all that is contained in those records, (3) by making improper disclosures, (4) by maintaining documents in purposes and manners for which they were not

---

**5.** On December 5, 1986, two panels of the United States Court of Appeals for the District of Columbia Circuit issued conflicting opinions regarding the availability of *Bivens* remedies in federal personnel actions for plaintiffs for whom the CSRA does not provide full relief. *See Hubbard v. EPA*, 809 F.2d 1, 6–11 (D.C.Cir. 1986); *Spagnola*, 809 F.2d at 19–28. On January 6, 1987, the full court vacated the conflicting portions of the two opinions and, on April 29, 1987, held a hearing *en banc*. The *en banc* court held that a court should not create a *Bivens* remedy for a claimant in Spagnola's (or Hubbard's) situation. *Spagnola v. Mathis*, 859 F.2d 223 (D.C.Cir.1988).

intended, (5) by refusing amendment or expungement of records, (6) by failing to collect information from plaintiff, (7) by maintaining a record regarding plaintiff's exercise of her First Amendment rights, and (8) by exempting the IG report from the Privacy Act. Defendants submit that these claims must be dismissed because they are barred by the two-year statute of limitations of the Privacy Act, and because, to the extent that she is alleging failure to amend, she has failed to exhaust administrative remedies.

■ As a preliminary matter, the Privacy Act provides for civil remedies only against an agency, not against individuals. *Brown–Bey v. United States*, 720 F.2d 467, 469 (7th Cir.1983); *Bruce v. United States*, 621 F.2d 914, 916 n. 2 (8th Cir.1980); *Ely v. Department of Justice*, 610 F.Supp. 942, 945 (N.D.Ill.1985), *aff'd*, 792 F.2d 142 (7th Cir.), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 651, 93 L.Ed.2d 706 (1986); *Windsor v. Federal Executive Agency*, 614 F.Supp. 1255, 1259 n. 6 (M.D.Tenn.1983), *aff'd without op.*, 767 F.2d 923 (6th Cir.1985). Accordingly, all Privacy Act claims plaintiff asserts against defendants other than the agencies must be dismissed.

■ Under 5 U.S.C. § 552a(g)(5):

An action to enforce any liability created under this section may be brought in the district court ... within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

Thus, in a "normal" Privacy Act claim, the statute of limitations begins to run when the plaintiff knows or should know of the alleged violation. *Tijerina v. Walters*, 821 F.2d 789, 798 (D.C.Cir.1987). However, in cases in which the Government has "purposefully misrepresent[ed] information that could establish it already has violated the Act," the period begins to run upon actual discovery of the misrepresentation. *Id.*

■ Plaintiff received her first redacted copy of the IG report, along with a letter indicating that the report was exempt from the access and amendment provisions of the Privacy Act, in February 1981, more than five years before she filed this lawsuit. Two years later, in February 1983, she told an OPM investigator that the information in the IG report was "confusing and incorrect." Thus, even applying the more liberal limitations period due to the Government's alleged willfull misrepresentations to plaintiff, her claims as to the IG report are barred. She admits in her amended complaint that by 1983, she had discovered the alleged incorrect statements in the report. Additionally, she knew in 1981 that she was denied access to the entire IG report, and that Treasury was claiming that the report was exempt from the provisions of the Privacy Act, such that she could not seek amendment.[6] Thus, those claims are barred by the statute of limitations.

In February and March 1981, several newspapers published articles about plaintiff's termination and the IG investigation, the substance of which led plaintiff to believe that a Treasury spokesman had provided some limited information about her. Plaintiff's claim stemming from that disclosure clearly is barred by the statute of limitations.

■ In July 1983, after she was denied employment at the Department of Com-

6. In July and August 1987, plaintiff was able for the first time to review an unredacted copy of the IG report. However, her claims regarding the IG report are still barred because she admits that in 1983 (if not in 1981), she had actual notice of inaccuracies in the report, as well as of how Treasury intended to proceed with regard to the report. In addition, the fact that Trea-

sury informed her again in 1987 that her file was exempt from the Privacy Act amendment provisions does not resurrect her claims. Any different result would allow plaintiffs with stale claims to file new, identical requests in order to start the statute of limitations period running anew, thus rendering the statute of limitations meaningless.

merce, plaintiff received a redacted copy of the OPM report. She alleges that it was then that she learned of the accusations against her, including the incident in Altman's office. At that time, she also was informed of the manner and purposes for which the information would be maintained and the procedure for seeking a Privacy Act amendment. She claims that at that point, the IG report "became transformed into a type of personnel document at Commerce and OPM," but that she was not given an opportunity to review the file and to make comments and questions. However, in spite of this actual knowledge of the alleged inaccuracies in the OPM report and in spite of the fact that she was not given the opportunity to provide further information, plaintiff did not seek amendment of the records, and waited three years before filing this lawsuit. Thus, her claims as to the OPM report are barred.[7]

 Some of plaintiff's claims are not, however, barred by the statute of limitations. Her claim that in October 1985, the IG provided her with an incomplete list of those to whom the IG report was distributed, is not barred. In addition, her claims that an OSC spokesman disclosed information from her records to a Jack Anderson reporter and that defendant Michael Driggs improperly disclosed information from her records to author John Donahue are not barred, as plaintiff learned of the alleged disclosures in 1986 and 1987, respectively. Finally, any claim that plaintiff might have that in 1986 the Secret Service improperly exempted her file from the Privacy Act provisions is not barred by the statute of limitations.

 Because the Court finds that most of plaintiff's claims under the Privacy Act are barred by the statute of limita-

tions, defendants' argument that plaintiff has failed to exhaust administrative remedies is largely moot. However, to the extent that it is relevant, exhaustion is required where a plaintiff seeks amendment of records under the Privacy Act. *Nagel v. United States Dept. of Health, Educ. and Welfare*, 725 F.2d 1438, 1440–41 (D.C.Cir. 1984). The only remaining Privacy Act claim seeking amendment is plaintiff's claim against the Secret Service. Judging from the December 16, 1986, letter plaintiff received from the Secret Service, plaintiff requested that the Secret Service amend her records, and the request was denied. Thus, plaintiff did comply with the exhaustion requirement as to the Secret Service, and that claim will not be dismissed.

**5. Constitutional Claims**

Plaintiff alleges violations of the First, Fourth, Fifth, Sixth, and Ninth Amendments of the Constitution, and seeks damages pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[8] Defendants argue that: (1) as to most of the defendants, plaintiff has not alleged specific actions by them which are alleged to be improper, (2) defendants have a qualified immunity from suit for plaintiff's constitutional claims, (3) all of the claims are barred by the applicable statute of limitations, (4) the CSRA and the Privacy Act are exclusive remedies which prevent plaintiff from asserting *Bivens* claims, and (5) plaintiff has failed to state a claim upon which relief can be granted.

a. *Qualified Immunity and Lack of Specificity*

 There are two ways in which plaintiff may overcome defendants' defense

---

**7.** On December 9, 1986, plaintiff made a request for an unredacted copy of the OPM report, as well as a request that many of the allegedly erroneous portions be deleted. However, those requests were made more than three years after plaintiff first received a redacted copy of the OPM report and almost six months after the complaint was filed. Furthermore, they were made subsequent to the filing of defendants' motion to dismiss. Again, having had her claims barred by the statute of limitations,

plaintiff cannot attempt to resurrect them by making a subsequent request.

**8.** *Bivens* and subsequent cases established that damage actions may be brought for violations of constitutional rights. Thus, *Bivens* created a damages remedy against federal officials that is analogous to the remedy against state and local officials provided by 42 U.S.C. § 1983.

of qualified immunity. If she argues that the actions objectively were unlawful, then she must plead that no reasonable official in that position "could have believed [the actions] to be lawful, in light of clearly established law...." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). However, where the alleged constitutional violation turns on an element of subjective intent, such as bad faith and malice, plaintiff must plead the unconstitutional motivation with specificity, according to a heightened standard of pleading. *Siegert v. Gilley,* 895 F.2d 797, 802 (D.C.Cir.1990), *aff'd,* — U.S. —, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Like the plaintiff in *Siegert,* plaintiff appears to ground her claims in allegations of malice and bad faith, thus requiring analysis under the heightened pleading standard. However, like the court in *Siegert,* the Court will read plaintiff's complaint liberally and also analyze plaintiff's claims using the objective route.

In order to defeat a defendant's claim of immunity under the objective standard, plaintiff must show that a defendant violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Additionally, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. For most of plaintiff's claims, the key question is whether "the stigmatizing nature of the Department's charges, her discharge, and the subsequent foreclosure of future employment opportunities, including government job opportunities, combined to deprive [plaintiff] of a constitutionally protected liberty interest in reputation without due process." *Doe v. United States Depart-*

*ment of Justice,* 753 F.2d 1092, 1104–5 (D.C.Cir.1985) (footnotes omitted). In addition, plaintiff asserts that she was improperly discharged for exercising her First Amendment rights.

■ Most of plaintiff's claims can be analogized to the claims in *Siegert,* 895 F.2d at 797. In that case, the defendant, the plaintiff's former supervisor, responded to a request for information on plaintiff's job performance. Similarly, defendants in this case participated in IG and OPM investigations in which investigators requested information about plaintiff's job performance. Thus, "the relevant question, under *Anderson,* is ... whether the constitutional right claimed by [plaintiff] was so clearly established that a candid response to such an official inquiry might give rise to liability for damages." And, like the court in *Siegert,* the Court concludes that the relevant law does not clearly establish that defendants' actions with respect to the investigations amounted to a constitutional violation.[9] In large part, defendants were simply responding to official inquiries with respect to plaintiff, and plaintiff has not established that those actions constituted a violation.

■ There are a few instances in which plaintiff has alleged improper disclosures by some defendants to third parties outside the employment context.[10] However, the Supreme Court has held that "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley,* — U.S. —, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991) (citing *Paul v. Davis,* 424 U.S. 693, 708–709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976)). "Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." *Siegert,* 111 S.Ct. at 1794. Moreover, any constitutional claims plaintiff might have had with respect to those disclosures are

---

**9.** Additionally, with respect to plaintiff's allegations that her Fourth, Sixth, and Ninth Amendment rights have been violated, these claims are frivolous; manifestly defendants have not violated any clearly established rights under these Amendments.

**10.** The Court is referring to plaintiff's allegations that an OSC spokesman discussed plaintiff's case with a Jack Anderson reporter and that Driggs provided information about plaintiff to author John Donahue.

barred by the Privacy Act. *See infra* p. 454.

Finally, under the reasonable person standard, defendants would not have qualified immunity with respect to plaintiff's claim that she was fired in retaliation for exercising her First Amendment rights. However, as discussed below, plaintiff's First Amendment claim is barred by the CSRA. *See infra* p. 454.

Turning then to a subjective analysis with regard to defendants' immunity defense, it is well-settled that a *Bivens* claim brought against a federal official in his or her individual capacity which turns on an unconstitutional motive must be pled with specificity. *Siegert,* 895 F.2d at 802. Plaintiff claims that defendants made false charges against her which were made maliciously, in bad faith, and with the intent to preclude her employment opportunities, harm her reputation, and limit her First and Fifth Amendment rights. However, as to half of the named defendants, plaintiff has failed to allege any specific actions which violated her constitutional rights. Thus, plaintiff's claims against James Baker, Malcolm Baldridge, John Simpson, Constance Horner, and Maria Johnson in their individual capacities clearly must be dismissed.

Turning then to the allegations against James King, Protected Sources A and B, Shigeki Sugiyama, Michael Driggs, Roger Altman, and Anthony Conques, the Court examines them in light of the heightened pleading standard. Although plaintiff in her amended complaint makes an attempt to meet the requisite specificity, she fails to do so. Her allegations of malice and bad faith are unsupported by direct evidence of improper motivation. Instead, plaintiff takes the Court through a litany of comments made by various defendants and then concludes that the comments were knowingly false and made with malice as part of a conspiracy against plaintiff. In addition, she fails to provide any direct evidence that the defendants retaliated against her for exercising her First Amendment rights. Thus, plaintiff has failed to meet the heightened pleading standard for

a case involving immunity, and the constitutional damage claims against these defendants must be dismissed. *See id.* at 803–05; *cf. Hobson v. Wilson,* 737 F.2d 1, 10, 25–31 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985) (where complaint referred to specific memoranda admitting that actions were taken with improper motivation, plaintiff could overcome qualified immunity defense).

b. *The CSRA and The Privacy Act as Exclusive Remedies*

Defendants also argue that the Court should not imply a *Bivens* action where Congress has already provided comprehensive statutory schemes which provide plaintiff with meaningful remedies. Specifically, they contend that the CSRA and the Privacy Act bar plaintiff's constitutional claims.

The Court agrees that the CSRA precludes plaintiff's *Bivens* claims. In *Bush,* 462 U.S. at 367, 103 S.Ct. at 2404, the Court found that where Congress had acted to regulate civil service employment actions, and had provided meaningful remedies for constitutional violations, courts should defer to the judgment of Congress and refrain from creating *Bivens* remedies. Recent decisions have made clear that "the preclusive effect of *Bush* extends even to those claimants within the system for whom the CSRA provides 'no remedy whatsoever.'" *Spagnola II,* 859 F.2d at 223 (citing *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988)). Thus, even though plaintiff was fired from a Schedule A position and then denied a Schedule C position, and Schedule A and Schedule C employees do not enjoy the same substantive and procedural protections provided members of the competitive service by the CSRA, plaintiff does not have a remedy for damages for constitutional violations outside of the CSRA. Thus, any damages claim plaintiff has regarding her termination for exercising her First Amendment rights is barred. The CSRA does not, however, preclude plaintiff's right to seek injunctive relief for vio-

lation of her constitutional rights. *Spagnola II*, 859 F.2d at 229–30.

Plaintiff's remaining constitutional damage claims, relating to disclosures of false information in plaintiff's records by certain defendants, analogously are precluded by the Privacy Act. Like the CSRA, the Privacy Act provides a comprehensive scheme for addressing plaintiff's concerns about the inaccuracy of the records and about disclosure of them to third parties. In establishing the Privacy Act, Congress has undertaken to balance the individual interests of the subjects with the interest in protecting certain records and assuring an efficient government. Therefore, pursuant to the *Bush* mandate that courts should refrain from implying a *Bivens* remedy when "special factors" counseling hesitation, such as Congressionally-provided remedies for constitutional violations, are present, the Court concludes that plaintiff's constitutional claims regarding her records and any disclosures by defendants about those records are barred. *See Bush*, 462 U.S. at 378, 103 S.Ct. at 2411.

6. Tort Claims

Plaintiff makes several claims for damages which she alleges are grounded in theories of common law tort. For each of these claims, the United States has been substituted as the exclusive defendant in place of the individually-sued defendants James Baker, Malcolm Baldridge, James King, John Simpson, Constance Horner, Maria Johnson, Michael A. Driggs, Roger C. Altman, Anthony L. Conques, and Shigeki Sugiyama, pursuant to the Federal Employees Liability Reform and Tort Compensation act of 1988. The federal government's sovereign immunity is waived only in the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* However, the FTCA provides that a suit against the United States cannot be instituted "unless the claimant shall have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a). Because exhaustion of administrative remedies is a jurisdictional requirement under the FTCA, *Odin v. United States*, 656 F.2d 798, 802 (D.C.Cir.1981), and plaintiff has not so exhausted her remedies, the Court

does not have jurisdiction over plaintiff's common law tort claims.

7. Failure To State a Claim

Plaintiff has not alleged a single violation against the United States Merit Systems Protection Board or Maria Johnson, either individually or in her official capacity. Accordingly, the claims against these defendants must be dismissed.

*Conclusion*

In sum, plaintiff's FOIA, APA, and 42 U.S.C. § 1985 claims are dismissed. All Privacy Act claims are dismissed, with the exception of claims arising out of (1) the 1985 IG report distribution list which plaintiff alleges was incomplete, (2) the alleged 1986 disclosures to Jack Anderson, (3) the alleged 1987 disclosures to John Donahue, and (4) the Secret Service's exemption of plaintiff's file from the Privacy Act provisions. In addition, to the extent that the foregoing Privacy Act claims remain, they remain only as against the agencies. All *Bivens* claims, as well as all common law tort claims, are dismissed. Finally, all claims against the MSPB and Maria Johnson are dismissed.