Maria VELIKONJA, Plaintiff,

v.

Robert S. MUELLER, III, Director,
Federal Bureau of Investigation,
Defendant.

No. CIV.A. 03–0832(ESH).

United States District Court,
District of Columbia.

Dec. 21, 2004.

John F. Karl, Jr., Nancy J. Malir, Mc-Donald & Karl, Washington, DC, for Plaintiff.

Tamara Lynn Ulrich, Peter T. Wechsler, U.S. Department of Justice Civil Division, Alexander Kenneth Haas, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff was employed as a special agent for the Federal Bureau of Investigation (the "FBI" or "Bureau") for eighteen years. She contends that toward the end of her tenure, her employer discriminated against her on the basis of her gender and retaliated against her for protected EEO activities in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. § 2000e *et seq.* She also alleges a violation of her First Amendment rights, claiming her employer improperly retaliated against her for her vocal advocacy of alternative work schedules, and alleges that her employer unlawfully disciplined her based upon documents maintained in violation of the Privacy Act, 5 U.S.C. § 552a *et seq.* Defendant has moved for summary judgment as to all four counts that remain after this Court's ruling in *Velikonja v. Mueller*, 315 F.Supp.2d 66 (D.D.C.2004) (hereinafter *Velikonja I* ). For the reasons set forth below, the Court concludes that defendant's motion for summary judgment should be granted.

## BACKGROUND

Plaintiff began working at the Bureau in 1985. In January 2000, she was selected for a position as an Assistant General Counsel/Supervisory Special Agent in the Bureau's National Security Law Unit (NSLU) in the Office of the General Counsel (OGC). A mother of three, plaintiff

preferred to work a schedule that deviated from the typical Bureau workday. She had been approved for "flex-time" in her prior position with the Bureau's Finance Division. Plaintiff did not receive written approval to continue a flex-time schedule upon her transfer, but claims that her new supervisor, Michael Woods, expressly approved her use of flex-time. (Pl.'s Facts ¶ 25). Throughout 2000 and 2001, Velikonja would often e-mail Woods with her planned work schedule. (Pl's Ex. FF (Velikonja–Woods E-mails).) Woods did not object to Velikonja's working flexible hours with his prior approval. (Pl.'s Ex. B. (Woods' Handwritten Notes, July 28, 2000) (hereinafter "Woods Notes").)

Plaintiff was the representative from OGC to the Female Special Agent Advisory Committee ("FSAAC"). In that capacity, she attended national meetings and was a vocal advocate of "flex-time" and "flex-tour" for FBI Agents. (*See* First Am. Compl. (hereinafter "Compl.") ¶ 18; Pl.'s Exs. O, P, Q (referencing work with FSAAC).) Her advocacy on work-life issues dates back to 1999. (*See* Pl.'s Ex. P.)

In spring of 2000, Woods began to observe discrepancies in the hours plaintiff claimed she worked on her time sheets as compared to the time she was actually seen working. (Def.'s Mot. to Dismiss Ex. G (Woods St., Feb. 22, 2001) at 3.) Between June 20 and July 18, he closely monitored plaintiff's arrival times [1] by accessing the electronic building access time logs. He also recorded her departure on some occasions based on his own observations. He compared the time logs and his observations with plaintiff's time entries, and compiled a summary chart which noted the discrepancies. (Def.'s Ex. A. (Woods Mem., July 19, 2000).)

On July 20, 2000, Woods met with Velikonja to discuss his observations and asked her to prepare a written response and to correct her time sheets. She did so later that day. (Def.'s Facts ¶¶ 3–4; Woods Notes.) During a routine inspection in October 2000, the Bureau's Inspection Division discovered Woods' records regarding plaintiff's time and attendance and instructed OGC to refer the matter to the Bureau's Office of Professional Responsibility (OPR). OPR began an official investigation into plaintiff's time and attendance on November 7, 2000. (Def.'s Mot. to Dismiss Ex. H (Velikonja St., July 16, 2002) at 13–14 (hereinafter "Velikonja July 2002 St."); Pl.'s Facts ¶ 7.)

After the meeting in July, Woods observed no further problems until the next spring, when he again noticed what seemed to be unauthorized absences. For example, plaintiff signed out at 4:30 p.m. on a day when she was allegedly observed leaving the Bureau's Quantico facility at 1:00 p.m. (Pl.'s Dep. Ex. 14 (Memorandum transmitting OGC's observations re: plaintiff's case to OPR, July 9, 2001) (hereinafter "OGC July 2001 Mem.").) After again comparing her time sheets with his observations of her departure times, Woods discovered five other occasions when plaintiff seemed to be absent without explanation. (*Id.* at 1312.) Woods relayed this new information to OPR in a memo dated July 9, 2001. (*Id.*)

On May 13, 2001, plaintiff was assigned to Temporary Duty in Macedonia. She returned to the United States early, but did not report back to NSLU. (Velikonja July 2002 St. at 18–19; Def.'s Ex. G (Parkinson St., Apr. 22, 2003) (hereinafter "Parkinson St.").) While plaintiff claims that she intended to return to Macedonia and was still on assignment, Woods concluded after discussions with her supervi-

---

1. The building access logs do not record departure times.

sor's overseas that Velikonja appeared not to be working for either unit. (Pl.'s Dep. Ex. 25 (Woods St., Mar. 24, 2003)).) Citing concerns about plaintiff's "veracity and trustworthiness" and considering that "NSLU handles some of the most sensitive information within the FBI," OGC transferred her against her will out of her position at the NSLU into the Procurement Law Unit in the Bureau's Office of General Counsel on July 23, 2001. (Parkinson St. at 3–4; see Velikonja July 2002 St. at 19–20.) Then, on July 27, 2001, the Bureau made a second referral to OPR of discrepancies in plaintiff's time and attendance reports, focusing on her temporary duty in Macedonia. (Parkinson St. at 3.)

On January 30, 2002, the first OPR investigation was completed. Based on its findings and conclusions, the Bureau suspended plaintiff for fourteen days and placed her on probation for one year because of her time and attendance abuses. (Def.'s Ans. Attach. (OPR Report, Jan. 30, 2002) (hereinafter "OPR Jan. 2002 Report").) The Bureau denied plaintiff's appeal. (Pl.'s Ex. BB.) Before the second investigation was completed, however, she resigned from the Bureau.

In *Velikonja I*, this Court dismissed Counts I and IV of plaintiff's Complaint. Her complaint contains four remaining Counts. In Count II she claims that OPR's investigations were delayed for discriminatory and retaliatory reasons. In Count III she alleges disparate discipline, claiming that the suspension and probation resulting from the first investigation were excessive and were imposed because of her gender. Plaintiff invokes the First Amendment in Count V, alleging that her employer retaliated against her for exercising her free speech rights by, *inter alia,* advocating alternative work schedules, and in Count VI, she alleges violations of the Privacy Act, claiming that the disciplinary action taken against her was based on notes and materials "unlawfully" maintained by her supervisor.

## ANALYSIS

### I. Summary Judgment Standard

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir. 1989).

The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genu-

ine issue for trial." *Calhoun v. Johnson*, No. 95–2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, No. 99–5126, 1999 WL 825425, at *1 (D.C.Cir. Sept. 27, 2000).

## II. Title VII (Counts II and III)

In Count II plaintiff alleges that OPR delayed the completion of its investigation for discriminatory and retaliatory reasons and that this delay "damaged [her] career." (Compl.¶ 54.) Plaintiff claims in Count III that the Bureau imposed a penalty that was excessive in comparison with that imposed on male agents for similar conduct.[2] (*Id.* ¶ 57.)

### A. Legal Standard

■ Counts II and III allege disparate treatment on the basis of gender, thus triggering the application of the *McDonnell Douglas* three-part "shifting burdens" test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff has the initial burden of proving a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. To do so, plaintiff must establish: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). If she succeeds, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* Defendant's burden is only one of production, and it "need not persuade the court that it was actually moti-

vated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). If defendant is successful, then "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted). At that point, plaintiff has the burden of persuasion to show that defendant's proffered nondiscriminatory reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *see also Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C.Cir.2003) ("[a]lthough the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (internal citations and quotation marks omitted).

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must

---

2. Plaintiff also suggests in her Opposition that the transfer to PLU and denial of the NSLU Unit Chief position are part of her Title VII claim. (*See* Pl.'s Opp'n at 45–47.) Plaintiff's Complaint, however, does not assert a Title VII claim based on the transfer or denial. "Ordinarily, absent a formal motion to … amend the complaint, a court does not treat

the contents of an opposition to a motion to dismiss as an amendment to a complaint." *Rohrbaugh v. Inv. Co. Inst.*, 2002 WL 31100821, at *5 n. 10 (D.D.C. July 2, 2002) (citing *Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295, 299 (D.C.Cir.1993); *Ali v. Dist. of Columbia*, 278 F.3d 1, 8 (D.C.Cir.2002)). The same standard applies here.

be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27–28 (D.C.Cir.1997). Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

### B. Excessive Penalty (Count III)

Plaintiff alleges in Count III that the fourteen-day suspension and the one-year probationary period that she received for time and attendance violations were excessive and amounted to disparate treatment based on her gender. She claims that "there exists a double standard of discipline at the FBI that operates to discriminate against female agents." (Compl.¶ 57).

In *Velikonja I*, this Court determined that "[defendant's] evidence [was] more than sufficient to articulate a legitimate, nondiscriminatory reason for its disciplinary actions." 315 F.Supp.2d at 78–79. For her claim to survive summary judgment, plaintiff must therefore show that a reasonable jury could conclude " 'that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Id.* at 79 (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C.Cir.2000)). In *Velikonja I*, it was "unclear based on the undeveloped record whether plaintiff [would] be able to proffer evidence of similarly situated individuals or otherwise demonstrate disparate discipline, [and thus] summary judgment on Count III[was] premature." *Id.* at 80.

■ Despite the opportunity for discovery, plaintiff has still not offered sufficient evidence to suggest that the agency's explanation for her punishment is unworthy of belief.[3] (*See, e.g.,* OPR Jan. 2002 Report.) The Court has once admonished plaintiff that its role under Title VII is *not* to review the correctness of the FBI's personnel decisions, but to determine whether a reasonable jury could find that the FBI discriminated against plaintiff on the basis of her gender. *See Velikonja I*, 315 F.Supp.2d at 81 ("[P]laintiff's case may not turn on the accuracy of the allegations against her."). Yet, plaintiff again expends great effort disputing the Bureau's underlying justifications for treating her as it did. While plaintiff might be right that the FBI *erroneously* found her behavior to be much more egregious than it actually was and that this error in judgment lead to an excessively severe disciplinary action, this is simply not the relevant inquiry. Whether the situation seems unfair to plaintiff is not the issue under Title VII. *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. She must show that the

---

**3.** Plaintiff may not even be able to make a *prima facie* case of disparate treatment if she cannot point to at least one male employee who received a lesser penalty who was in fact "similarly situated." *See, e.g., Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.Cir.1999); *Robinson v. Detroit News, Inc.*, 211 F.Supp.2d 101, 112 (D.D.C.2002) (to make out a *prima facie* case, "the plaintiff bears the burden of proving that the male employees were similarly situated and then treated unequally"). Defendant does not address the validity of plaintiff's *prima facie* case in its motion for summary judgment, focusing instead on whether plaintiff can show that the Bureau's legitimate reasons for the penalty imposed are pretextual. Given the Court's finding that the FBI has articulated legitimate reasons, the success of plaintiff's case ultimately turns on whether she can rebut those reasons with evidence of unlawful discrimination. Thus, the Court will address the parties' analysis and consider whether plaintiff's evidence with respect to the discipline of male employees shows pretext.

explanation given is a phony reason."). A district court judge does not sit as a "super-personnel department that reexamines an entity's business decisions." *Id.* (internal citation and quotation marks omitted). *See also Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C.Cir.2002) (noting with approval "courts' reluctance to become involved in micromanagement of everyday employment decisions") (internal citation omitted). To meet her burden, plaintiff must offer evidence upon which a reasonable jury could conclude that the FBI decision-makers did not rely in good faith upon the reasons given for the disciplinary penalty.

Citing to *Reeves*, plaintiff nonetheless argues that she need only show that the FBI's decisions were erroneous. (Pl.'s Opp'n at 35, 41–43.) Plaintiff is incorrect in her analysis of the law. The *Reeves* Court never held that exposure of an error-ridden process would by itself be enough to create an inference of discrimination.[4] Not unlike the D.C. Circuit cases, *Reeves* suggests only that "proof that the defendant's explanation is *unworthy of credence* ... is probative of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (emphasis added). Plaintiff's unsupported contention that "*Fischbach* is no longer good law after the Supreme Court's decision in *Reeves*," is simply not correct. (Pl.'s Opp'n at 41) The D.C. Circuit relied upon *Fischbach* in *Waterhouse*, which was handed down two years after the Supreme Court decided *Reeves*. *See Waterhouse*, 298 F.3d at 995. There, the Circuit cited *Fischbach* for the now well-established proposition that "courts are without authority to second-guess an employer's personnel decision absent demon-strably discriminatory motive." *Id.* (internal citation and quotation marks omitted). Plaintiff·thus cannot use *Reeves* to support her claim that errors alone raise an inference that gender bias actually motivated the Bureau's disciplinary decision.

■ The FBI's legitimate, non-discriminatory reasons for imposing the 14–day suspension and a one-year period of probation were that plaintiff

> falsified her arrival times by more than one hour per day on average, falsified her departure times by as much as four and a half hours, did not follow her unit's regular work schedule, did not receive authorization to use a flex-time work schedule, routinely took more than double the permissible three-hour credits for exercise time per week, and improperly failed to deduct a half-hour for lunch on two of every three work days.

*Velikonja I*, 315 F.Supp.2d at 78. The FBI's reasoning is set forth in greater detail in the reports and rulings by OPR. (*See, e.g.,* OPR Jan. 2002 Report; Pl.'s WW at 1348 (OPR Addendum, Nov. 15, 2001) (analyzing disciplinary case precedent); Pl.'s Ex. BB (Denial of Appeal).)

■ Plaintiff argues that these reasons must have been a pretext for discrimination because she was treated differently from similarly situated males. She points to four male agents who worked at FBI headquarters who received an average of 1.6 days of suspension and no probation compared with her 14 days of suspension and one year of probation. (She also notes that the one other female agent received a five-day suspension, though the Court is unsure how this is relevant to the inquiry.)

---

**4.** Plaintiff also cites to the Sixth Circuit case of *In Re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988), for the proposition that "[o]ne way for Ms. Velikonja to demonstrate pretext is to show that the FBI's asserted business judg-ment was so 'ridden with error that defendant could not honestly have relied upon it'" (Pl's Opp'n at 43), but even *Lewis* emphasizes the *honesty*, and not the wisdom, of defendant's belief in its proffered reasons.

Were these male colleagues in fact similarly situated, *i.e.*, "nearly identical" in their employment situation, and had they committed offenses of "comparable seriousness," the cited discrepancies might well be probative. *Holbrook*, 196 F.3d at 261. However, as defendant notes, "[t]he chart [of discipline cases disclosed by the FBI] indicates that the time and attendance violations in these four cases were far less severe than those committed by plaintiff." (Def.'s Reply at 25.) *See Shelborne v. Runyon*, 1997 WL 527352, at *6 (D.D.C. Aug. 21, 1997) (in order to be "similarly situated" plaintiff's coworkers " 'must have engaged in conduct similar to [plaintiff's] without such differentiating or mitigating circumstances that would distinguish the conduct or the appropriate discipline for it' ") (internal quotation marks omitted) (citing *Mazzella v. RCA Global Comm., Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y. 1986)).

The record shows that the offenses of the four males to whom plaintiff seeks to compare herself were (1) taking flight lessons during a lunch break which extended into duty hours; (2) signing out at 5:00 pm when the employee left at 4:45 pm and got into an accident with a Bureau vehicle; (3) including commuting time on the employee's time sheet; and (4) falsifying the employee's time sheet on four occasions. (*See* Def.'s Reply at 25; Pl.'s Ex. WW at 1369 (FBI's record of time and attendance disciplinary cases).) The FBI's investigation of plaintiff's conduct, in contrast, determined that she had falsified her time sheet on 24 occasions over the course of a month and had continued to misrepresent how many hours she was working even after her superiors discussed the problem with her. These factors, among others, differentiate her case from those who were disciplined less severely. (*See* OPR Addendum, Nov. 15, 2001.) This explanation for the differing punishments is more than reasonable on its face, and the record is devoid of any evidence to suggest that OPR or the agency did not honestly believe in it or that agency personnel were motivated in any way by a discriminatory animus when disciplining plaintiff.

Nor do Velikonja's repeated conclusory references to Woods' personal crusade to ruin her career have any bearing on whether the FBI's proffered reasons for imposing a 14-day suspension are pretextual. (*See, e.g.*, Pl.'s Opp'n at 54.) Not only does she fail to provide any evidence to support her accusations or relate the alleged animosity to her gender, but her own words belie her claim. In her November 2000 letter to the FBI's Ombudsman, Velikonja writes of Woods: "Although I was upset with him at the time [I found out he had been monitoring my time and attendance], I believe now that he simply was not aware of the schedules that many agents keep, and did not realize that by making a record of it another entity, such as Inspections, could force him to turn over his notes." (Pl.'s Ex. T at 1014.) She also notes that Woods and others at OGC "opposed the referral." (*Id.* at 1013.) These facts undercut any claim that Woods was biased against the plaintiff because of her sex or that any bias tainted his participation in the investigation.[5]

5. Plaintiff argues that Woods must have had ulterior motives in reporting on her activities because he had always approved her time sheets and was aware that she worked at home on a regular basis. There are a number of reasons why Woods' approval of "flextime," even if true, would fail to raise an inference of discrimination with respect to the disciplinary action. Primarily, Woods neither chose to refer her case to OPR nor participated in the determination of the penalty. Moreover, Woods' agreement to let Velikonja work flexible hours with his approval would not be inconsistent with his concern about her fail-

It also bears noting that it was not Woods or anyone else within OGC who made the decision to discipline Velikonja. OPR conducted its own investigation into the evidence presented by OGC and came to its own conclusions. When plaintiff appealed the decision, yet another decisionmaker (Francis Gallagher of the Bureau's Inspection Division) considered the evidence and decided the 14–day suspension and one-year probationary period were appropriate. (*See* Pl.'s Ex. BB (Denial of Appeal).) Significantly, plaintiff does not claim that these other officials bore any animus towards her.

Furthermore, the record lacks any evidence suggesting that once confronted with the referral and observations from OGC, and upon consideration of plaintiff's rebuttals, the Bureau did not have good faith reasons for its chosen penalty. Although it may well be that Velikonja faced difficulties in balancing her work schedule with her family obligations, she simply has not put forth any evidence that she was held to a different standard than male FBI agents. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nor does the evidence suggest in any way that the agency's disciplinary action was retaliatory. Therefore, the Court must grant summary judgment to defendant on Count III.

**C. Delay (Count II)**

■ Plaintiff claims that the FBI delayed the final disposition of her case for discriminatory and retaliatory reasons. (Compl.¶ 54.) The investigation began on November 7, 2000 and did not conclude until almost 15 months later on January 30, 2002.[6] To make out a disparate treatment discrimination claim, plaintiff must first provide evidence that she has been treated differently from employees outside her protected class. As plaintiff has not even attempted to show that male FBI employees' disciplinary cases were resolved more quickly than hers, the Court need only address the claim of retaliation.

■ In order to establish a *prima facie* case of retaliation, plaintiff must demonstrate that: (1) she engaged in statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). An "employment decision does not rise to the level of an actionable adverse action ... unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. Wash. Metro. Area Transit Auth.,* 102 F.Supp.2d 24, 29 (D.D.C.2000). In a retaliation case, a causal connection "may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985). Once the requisite *prima facie* showing has been made, the same burden shifting analysis used for discrimination claims applies. *See Cones v. Shalala,* 199 F.3d 512, 520–21 (D.C.Cir.2000).

The first inquiry must necessarily be whether the delay was an "adverse action."

---

ure to work the hours she had indicated on her time sheets.

**6.** Plaintiff claims that because the investigation exceeded 180 days, the agency was in violation of the Settlement Agreement Amendment in the Black Special Agents case. (Pl.'s Opp'n at 14, 55.) *See Johnson v. Ashcroft,* No. 93–0206, (D.D.C., filed May 17, 2000).

Even if the Amendment were applicable to plaintiff, however, the Bureau did not violate it. As provided for in the Amendment, OPR sought and received approval for a 30–day extension each month following the 180–day period. (*See* Def.'s Ex. H (180–day Memos); Def.'s Mot. at 6–7.)

In *Velikonja I,* the Court noted that the "delay of the investigation may arguably have a sufficient adverse effect on plaintiff's employment to be actionable." 315 F.Supp.2d at 76. Velikonja claims that the pending investigation put her career on hold. Indeed, she was "transferred to the Procurement Law Unit [PLU] *pending the results of OPR matters.*" (Parkinson St. at 4 (emphasis added).) It could thus be argued that the delay affected the conditions of her employment by causing her to languish in PLU instead of advancing in NSLU. Although it seems more likely that her exclusion from NSLU was a result of the underlying allegations regarding her time and attendance (and not the delay in the investigation), the Court will assume that the delay constituted an adverse action.

Plaintiff engaged in protected activities when she wrote to the FBI Ombudsman regarding the investigation on November 7, 2000, met with an EEO Counselor on December 4, 2000 and October 22, 2001, and filed a formal complaint of discrimination on November 6, 2001. (*See* Pl.'s Facts ¶¶ 97–102.) Because OPR's investigation proceeded throughout this time period, and was delayed until January 30, 2002, plaintiff has demonstrated temporal proximity between the adverse action and the protected activity. Thus, she has arguably put forth a *prima facie* case of retaliation.

The burden now shifts to defendant to articulate a legitimate, non-discriminatory reason for the delay. Lynn Schiera, the OPR employee responsible for the adjudication of Velikonja's case, states that the delay was due to OPR's heavy caseload; the complexity of the case, which required investigation of multiple violations and research on several different time and attendance policies; and the additional allegations of July 2001 (which halted the investigation until it was decided whether the new issues would be treated separate-

ly). (*See* Def.'s Ex. E (Schiera St., Apr. 2003).) These are legitimate factors that could easily cause delay, and thus it falls to plaintiff to "adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination." *Paquin,* 119 F.3d at 27–28. In response, plaintiff merely suggests that defendant's failure to offer a reason for Woods' delay in responding to OPR's request for further information and a recommendation in 2001 (*see* Pl.'s Facts ¶¶ 129, 131) sheds doubt on the genuineness of the proffered reasons. It is not defendant's burden, however, to justify every action that may have been a factor in the delay. Rather, the FBI need only articulate a legitimate reason for the delay.

Presumably in an additional effort to demonstrate pretext, plaintiff twice refers to an OPR employee's admonishment that she should be "'careful' about filing an EEO complaint as OPR would view filing a complaint as 'retaliatory.'" (Pl.'s Opp'n at 12, 49). Simply using the word "retaliatory" in reference to Velikonja's (not OPR's) actions does not suggest that the Bureau is lying about the reasons for its delay. Even if some unidentified OPR employee's suggestion to be "careful" constituted competent evidence, which it does not, and even if it could be construed as discouraging protected activity, plaintiff has not shown that the employee was involved in the delay or had any influence whatsoever over the process. *See Simms v. U.S. Gov't Printing Office,* 87 F.Supp.2d 7, 9 n. 2 (D.D.C.2000) ("'[S]tray remarks,' even those made by a supervisor ... where, as here, they are unrelated to an employment decision involving the plaintiff" do not create a triable issue of discrimination.).

Thus, plaintiff has not offered any evidence that the reasons given for the delay were a pretext for retaliation, and the Court's review of the record fails to reveal that any delay in the conduct of the inves-

tigations by OPR related in any way to plaintiff's protected activity.[7] Thus, summary judgment on plaintiff's claim of undue delay is appropriate.

## III. Privacy Act (Count VI)

Plaintiff alleges in Count VI that during the Bureau's investigation of her time and attendance practices, it intentionally created and relied upon records in violation of the Privacy Act and that these violations resulted in irreparable damage to her career. Specifically, she invokes 5 U.S.C. § 552a(e)(5), claiming that her employer's failure to maintain accurate records resulted in an adverse determination against her, as well as 5 U.S.C. § 552a(e)(2), alleging that her employer failed to obtain information directly from her "to the greatest extent practicable." She seeks damages for violations of both sections under 5 U.S.C. § 552a(g)(1)(C)-(D). Defendant argues that plaintiff's Title VII claim preempts her Privacy Act claims and that, even if it does not, her Privacy Act claims have no merit.[8]

### A. Failure to Maintain Accurate Records

██ Pursuant to 5 U.S.C. § 552a(g)(1)(C), an individual has a cause of action against a federal agency that maintains a system of records when it

> fails to maintain any record … with such accuracy … and completeness as is necessary to assure fairness … and consequently a determination is made which is adverse to the individual.[9]

To obtain damages for either this claim or a claim under subsection (g)(1)(D), plaintiff must also prove that the agency's conduct was "intentional and willful." 5 U.S.C. § 552a(g)(4). In sum, plaintiff must establish "inaccurate records, agency intent, proximate causation, and an 'adverse determination.'" *Toolasprashad v. Bureau of Prisons,* 286 F.3d 576, 583 (D.C.Cir. 2002). Proof of "actual damages" is also required in order to recover either the statutory minimum of $1,000 or damages beyond this amount. *See* 5 U.S.C. § 552a(g)(4); *Doe v. Chao,* 540 U.S. 614, 124 S.Ct. 1204, 1207, 157 L.Ed.2d 1122 (2004).

Velikonja seems to suggest three instances of inaccurate or incomplete records:[10] (1) OGC's referral to OPR in October 2000, which included Woods' July 2000 summary chart comparing Velikonja's time

7. Again, it is noteworthy that with the exception of Woods' alleged delay of approximately 90 days in responding to an OPR request (*see* Pl.'s Opp'n at 45), plaintiff fails to identify any person in OPR who was both responsible for the delay and had a motive to retaliate against her.

8. Given the Court's resolution of plaintiff's claims under the Privacy Act on the merits, it need not revisit defendant's argument that Title VII preempts plaintiff's Privacy Act claim. *See Velikonja I,* 315 F.Supp.2d at 77–78.

9. This language tracks 5 U.S.C. § 552a(e)(5) with one exception. Subsection (e)(5) reads *"reasonably* necessary to assure fairness." Courts have not found a significant difference between the two standards. *See, e.g., Doe v.* *United States,* 821 F.2d 694, 697 n. 8 (D.C.Cir. 1987) (noting that the standard for accuracy is stated in subsection (e)(5) and "reiterated" in subsection (g)(1)(C)); *Bettersworth v. FDIC,* 248 F.3d 386, 390 n. 3 (5th Cir.2001) ("Th[e] statutory obligation is made enforceable by substantively identical language in subsection 552a(g)(1)(C)."). Further, contrary to defendant's suggestion (Def.'s Mot at 31, 35), exhaustion of administrative remedies is not required to bring a damages action under either subsection g(1)(C) or (D). *See, e.g., Nagel v. U.S. Dep't of Health, Educ., and Welfare,* 725 F.2d 1438, 1441 (D.C.Cir.1984).

10. With the possible exception of Bowman's e-mail, which will be discussed *infra,* these documents qualify as "records" for purposes of the Privacy Act because they are "about"

sheet entries to the office building's electronic door log; (2) OGC's July 9, 2001 response to OPR's request for observations about Velikonja's case, including aggravating and mitigating factors; and (3) Marion ("Spike") Bowman's (another supervisor's) e-mail to the General Counsel regarding her reputation in the workplace and performance while on temporary duty in the Hague.[11] She claims that these "records" led to the Bureau's decisions to discipline her severely, transfer her out of NSLU, and decline to consider her for the position of NSLU Unit Chief. (*See* Pl.'s Opp'n at 2.) The FBI does not deny that these decisions were "adverse determinations," but argues that in making them the agency considered a range of evidence, not limited to the supposedly inaccurate records. (Def.'s Mot. at 37.) Therefore, according to defendant, plaintiff cannot show causation. Defendant also argues that plaintiff cannot establish that its records were inaccurate as defined by the Act or that the agency acted intentionally or willfully in collecting and using them.[12] (Def.'s Mot. at 39–40.)

### 1. Referral with Summary Chart

■ The summary chart prepared by Woods and forwarded to OPR consists of entries from Velikonja's time sheets in June and July 2000, as compared with the electronic access logs from the building, along with Mr. Wood's personal observations for some of the days. (*See* Def's Ex. A (Woods Mem., July 19, 2000).) Velikonja does not allege that Woods inaccurately recorded the time sheet or entry log information, but rather argues that the report was inaccurate because Woods did not elicit information from her directly. (*See* Pl.'s Opp'n at 29.) Whether plaintiff had a chance to respond to or explain the chart, however, has no bearing on whether the chart was *accurate*. Rather, this claim is more properly addressed under subsection (e)(2), Collection of Information. (*See* Section III(C) *infra.*)

an individual. *See Tobey v. N.L.R.B.,* 40 F.3d 469, 471 (D.C.Cir.1994). Although Woods' summary chart (*see* Def.'s Ex. A) began as private notes, which would not normally be considered an agency record, private notes may "evanesce" into records when they have been incorporated into an employee's file for decision-making purposes. *Chapman v. NASA,* 682 F.2d 526, 529 (5th Cir.1982). *See also* 5 U.S.C. § 552a(a)(4) (defining "record" as: "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a fingerprint or voice print or a photograph"); OMB Privacy Act Guidelines, 40 Fed.Reg. 28,948, 28,952 (July 9, 1975) ("Uncirculated personal notes, papers and records which are retained or discarded at the author's discretion and over which the agency exercises no control or dominion (e.g., personal telephone lists) are not considered to be agency records within the meaning of the Privacy Act.")

11. Plaintiff also refers to "information regarding Velikonja's status during July 2001, when she was on leave from her assignment to Macedonia" as part of her inaccurate records claim. (Pl.'s Opp'n at 26.) However, she does not contest a specific record, making it difficult, if not impossible, for the Court to evaluate this claim. Presumably she has in mind the second referral to OPR on July 27, 2001, when Woods described his inquiry into Velikonja's activities upon returning from Macedonia. (*See* Woods Mar. 2003 St.) The second referral did not lead to an "adverse determination," however, because Velikonja resigned *before* the investigation was completed. Thus, it cannot be the basis of a claim under subsection (g)(1)(C).

12. Under the statute, "maintain" means "maintain, collect, use or disseminate." 5 U.S.C. § 552a(a)(3).

██ The only other alleged "inaccuracy" identified by plaintiff is that "review of the entry log for NSLU would on occasion erroneously suggest that she was not in the office at times when she was at her desk" because "she would often be let into the offices without having to use her key card. This happened three or four times per month." (Pl.'s Facts at ¶ 80; Pl.'s Opp'n at 7.) Here, Velikonja fails to raise a genuine dispute as to causation. Even if the no-key-card days could somehow be considered inaccuracies,[13] plaintiff refers to only three or four "errors" per month whereas the disciplinary decision against her was based on at least 24 falsifications in less than a month. (See OPR Jan. 2002 Report at 1277.) The decisions to transfer Velikonja and to abstain from considering her for the Unit Chief position were both based on the NSLU's concerns about her lack of candor concerning her time and attendance. These concerns stemmed from ample evidence apart from the exact number of discrepancies reflected on Woods' summary chart. (See Id; Woods Mar. 2003 St.; Parkinson St.)

The record therefore clearly shows that it was not any alleged inaccuracies, if they can even be described as such, that "actually caused" the adverse determinations against her. *Hubbard v. U.S. Envt'l Prot. Agency,* 809 F.2d 1, 5 (D.C.Cir.1987). *See* 5 U.S.C. § 552a(g)(1)(C); *Toolasprashad,* 286 F.3d at 583. Thus, plaintiff fails to create a triable issue of fact with respect to this claim.

## 2. OGC 2001 Response to OPR

██ Velikonja next takes issue with the information provided in OGC's update to OPR in July 2001. (*See* OGC July 2001 Mem.) In the memo, Woods responded to OPR's request for "aggravating factors" by describing several new issues that had arisen with respect to plaintiff's time and attendance.[14] First, Woods reported a discussion with another employee who had seen Velikonja "apparently leaving" the parking lot of the FBI Academy at Quantico, where she was attending a conference, shortly after 1:00 pm on April 12, 2001. According to Woods, he had understood that she would either stay at the conference in the afternoon or work in the Quantico library. (*Id.* at 1311–12.) After this incident, Woods again began to monitor plaintiff's entry and exit times from the building. Woods' memo noted five dates in Spring 2001 (April 30, May 3, May 4, May 7, and May 9) when his observations of when plaintiff was in the office during the late afternoon did not match what she then reported on her time sheet. "[T]hese discrepancies could not be explained by any authorized work at home." (*Id.* at 1312.) Finally, he cited the "detrimental effect on morale" engendered by "Velikonja's conspicuous absences." (*Id.*) He identified no mitigating factors, stating: "There are no extraordinary circumstances present here." (*Id.* at 1313.)

Plaintiff contends that OGC omitted mitigating factors and intentionally included bogus aggravating factors. Specifically, she alleges that Woods' rendition of the Quantico incident and her unexplained absences on five other occasions was inaccurate. (Pl.'s Opp'n at 24–26.) She states that she was merely getting something from her car when the other employee met

---

13. Again, plaintiff's argument relates to the interpretation of the chart, not its accuracy, for it is clear that the comparison chart accurately reflected the discrepancy between the entry log and the time sheets. (*See* Def.'s Ex. A. (Woods Mem., July 19, 2000).)

14. Although Larry Parkinson is the signing official on the memo, Woods admits that he drafted it. (Woods Dep. at 35.)

her in the parking lot and that she spent the rest of the day working in Quantico's library. She does not provide an alternative explanation for her apparent absences on the other dates. Plaintiff also claims that Woods should have identified his alleged approval of "flex-time" as a mitigating factor.[15]

In contrast to the few alleged inaccuracies in Woods' summary chart, the undisputed record shows that the aggravating factors identified in the July 9 memo played a role in OPR's decision to discipline Velikonja at the upper range of severity for time and attendance violations. (OPR Addendum, Nov. 15, 2001 at 1353 (citing plaintiff's "repeated inability ... to adhere to Bureau regulations" and specifically discussing the Quantico incident, five occasions of time sheet discrepancies, and workplace reputation); OPR Jan. 2002 Report ("Your apparent disregard of Bureau T & A regulations in April 2001 ... and your inability to adhere to these regulations ... are further aggravating factors.").) Plaintiff has thus made a showing of causation, and the Court must therefore analyze whether plaintiff can satisfy the other elements for a claim under § 552a(g)(1)(C).

 The analysis of the "inaccurate records" element of a Privacy Act claim depends on whether the "truth" underlying the challenged statements "is clearly provable or relatively easily ascertainable." *Toolasprashad,* 286 F.3d at 583 (quoting *Deters v. U.S. Parole Comm'n,* 85 F.3d 655, 658 (D.C.Cir.1996)). In the "typical"

case, where the truth can readily be ascertained, "it is feasible, necessary, and proper, for the agency and, in turn, the district court to determine whether each filed item of information is accurate." *Deters,* 85 F.3d at 658 (citation omitted). Thus, when "the facts at issue [are] clearly provable," the district court must conduct a *de novo* review of the evidence to determine the accuracy of the records. *Sellers v. Bureau of Prisons,* 959 F.2d 307, 311 (D.C.Cir. 1992). On the other hand, when the disputed information is a subjective opinion or is otherwise incapable of being verified, the court should not make credibility determinations but instead should ensure that the agency acted fairly, for example, by documenting the dispute in the individual's file. *Id.* at 311; *Doe,* 821 F.2d at 699–701; *Webb v. Magaw,* 880 F.Supp. 20, 24–25 (D.D.C.1995). If subjective negative or damaging information was "based on a demonstrably false premise," retention of the information would violate the Act. *White v. Office of Pers. Mgmt.,* 787 F.2d 660, 662 (D.C.Cir.1986). The Act, however, is intended to remedy "factual or historical errors," and is not a vehicle for addressing "the *judgments* of federal officials ... reflected in records maintained by federal agencies." *Kleiman v. Dep't of Energy,* 956 F.2d 335, 337–38 (D.C.Cir. 1992) (emphasis in original and citation omitted).

Applying this framework, the Court must address whether the true circumstances of Velikonja's alleged repeat offenses are readily ascertainable.[16] *Sellers,*

---

15. The Court is not prepared to find this supposed omission to be a false statement in the context of the Privacy Act. *See DeBold v. Stimson,* 735 F.2d 1037, 1040 (7th Cir.1984) ("Neither [the Freedom of Information Act] nor the Privacy Act requires an agency to create a record that does not exist."). *See also* note 5 *supra.*

16. Plaintiff seems to misunderstand the legal standard. She repeatedly argues that because the facts contained within the records were "capable of being verified," her supervisors had an obligation to investigate the allegations against her before forwarding them to OPR. (*See* Pl.'s Opp'n at 25.) The "capable of being verified" standard is not a measure of accuracy itself, but a threshold question that

959 F.2d at 311. The observations of Woods and others regarding Velikonja's whereabouts on the dates in question are not easily falsifiable. Plaintiff insists that the allegations were untrue, but does not "point to actual evidence that brings [OGC's] account into dispute." *Blazy v. Tenet*, 979 F.Supp. 10, 22 (D.D.C.1997). Thus, the Court must instead consider whether the agency acted fairly.

■■■■■ "[A]n agency need not keep perfect records, but must act reasonably to assure their accuracy." *Dickson v. Office of Pers. Mgmt.*, 1991 WL 423968, at *15 (D.D.C. Aug. 27, 1991). Unsubstantiated allegations, when identified as such, are not inaccuracies within the meaning of the Privacy Act. *See Jones v. U.S. Dep't of Treasury*, No. 82–2420, slip. op. at 2–3 (D.D.C. Oct. 18, 1983) (ruling it reasonable for the agency to maintain a record concerning an unsubstantiated allegation of sexual misconduct by employee that had been conveyed to it by state and local authorities); *Graham v. Hawk*, 857 F.Supp. 38, 40 (W.D.Tenn.1994), *aff'd*, 59 F.3d 170, 1995 WL 363393 (6th Cir.1995) (unpublished table decision) ("[R]ecords are maintained with adequate fairness if they accurately reflect the nature of the evidence," *i.e.*, indicate that the information is a hearsay report from an unnamed informant.); *Hass v. U.S. Air Force*, 848 F.Supp. 926, 931 (D.Kan.1994) (although it acknowledged the possibility that an agency relied upon incorrect information in making a determination about plaintiff, the court found no Privacy Act violation because no evidence suggested that the information was *recorded* inaccurately).

Pursuant to these standards, Woods acted fairly to assure the accuracy of the agency's records. Rather than stating his observations as to Velikonja's time and attendance practices in April and May 2001 as hard evidence, Woods clearly identified the nature of the evidence, as suggested in cases such as *Graham* and *Sellers*. He wrote: "It is essential to note that the above simply represents the observations of SSA Velikonja's supervisors and is not the product of any sort of thorough investigation." (OGC July 2001 Memo at 1312.) Furthermore, he acknowledged that he did not know Velikonja's side of the story: "Due to the pending OPR investigation, SSA Velikonja was not questioned regarding these matters." (*Id.*) With regard to his description of morale issues within NSLU, Woods was offering a subjective assessment from his own observations. *See McCready v. Principi*, 297 F.Supp.2d 178, 192 (D.D.C.2003) ("The Privacy Act is about correction of facts, not opinions or conclusions."). In his deposition, Woods explained that he heard "heard comments from most of the people that worked in the NSLU space" and gave four names. (Woods Dep. at 63.) "We were working very long hours," he stated, "and it became very apparent who was there and who wasn't." (*Id.* at 65.) Plaintiff offers no evidence to suggest that Woods did not have a basis for his memo's account of her workplace reputation and its effect on morale. Thus, the Court finds that OGC treated plaintiff with fairness in transmitting its observations to OPR.

Even if the Court were to find that Mr. Woods' statements were not fairly maintained for accuracy, plaintiff still could not make out a claim for damages because she cannot meet the high threshold regarding intent. *See Waters v. Thornburgh*, 888 F.2d 870, 875–77 (D.C.Cir. 1989), *abrogated on other grounds, Doe v. Chao*, 124 S.Ct. at 1207. For instance, in *Laningham v. United States Navy*, 813 F.2d 1236 (D.C.Cir.1987), the Circuit held

determines what standard of review a court should use.

that intentional or willful means "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Id.* at 1242 (internal citation and quotations omitted). *See also Tijerina v. Walters*, 821 F.2d 789, 799 (D.C.Cir.1987) ("intentional or willful" conduct is "somewhat greater than gross negligence," demonstrating a "flagrant disregard" for rights the Act protects). Plaintiff cannot avoid summary judgment merely by presenting evidence that "the government handled a matter in a disjointed or confused manner, or that the government acted inadvertently to contravene the Act." *Waters*, 888 F.2d at 875–76 (internal citations and quotation omitted). Summary judgment is proper where the agency presents evidence explaining its conduct and its grounds for believing its action to be lawful. *See Laningham*, 813 F.2d at 1243 (D.C.Cir.1987).

The memo drafted by Woods does not come close to satisfying this high standard of culpability. There is no indication that his intent in reporting the new incident and audit results to OPR was anything other than to discharge his duties as Unit Chief. He did not believe that his statements were inaccurate, his wording in the memo was measured and qualified, and Velikonja has yet to provide any persuasive evidence that his statements were untrue. He further states in his deposition that, "plaintiff's return to a pattern of non-attendance in the workplace was a fact as far as I was concerned." (Woods Dep. at 55.) He also appears to have been relying on OPR for further investigation, stating, "I knew that when information is submitted to OPR, that they investigate." (*Id.* at 69.) Indeed, OPR had specifically instructed OGC *not* to conduct its own investigation. (*See* Pl.'s Ex. OO (Notification of Investigation, Nov. 7, 2000).) Thus,

Woods reported unsubstantiated facts (and identified them as such), along with his own observations and opinions. This conduct cannot be equated with a "flagrant disregard" of plaintiff's rights. *Tijerina*, 821 F.2d at 799.

### 3. Bowman's E-mail

 Plaintiff also argues that Bowman's e-mail of September 26, 2000, to the General Counsel, Larry Parkinson, was not maintained with reasonable accuracy. (*See* Pl.'s ZZ (Bowman E-mail).) The e-mail discussed her performance while assigned to the United Nations' Hague office, stating that, "Maria has a long history in the Bureau of being difficult to get along with," and that "[t]he fundamental issue that everyone seemed to focus on was her time management," among other negative comments. (*Id.*) Plaintiff claims that this e-mail is based solely on information from biased third-parties. Moreover, were it not for this e-mail, "Mr. Parkinson would not have acquiesced in Mr. Woods' efforts to destroy Velikonja's career." (Pl.'s Opp'n at 25.)

Whereas the initial referral and the update to OPR were part of the FBI's "system of records," within the meaning of the Act, the issue is less clear-cut with respect to Bowman's e-mail. There is no evidence in the record that the e-mail became part of plaintiff's file or that the e-mail was relied upon in any of OGC's personnel decisions. The Privacy Act does not remedy all misinformation that may flow through an agency. If a plaintiff seeks damages, as plaintiff does here, the Act's scope is limited to the accuracy of records that have actually been used to make a decision regarding the employee. *See* 5 U.S.C § 552a(g)(1)(C). Thus, Bowman's e-mail cannot be the basis of a Privacy Act

claim.[17]

In sum, plaintiff has failed to raise a triable issue on her claim that the agency failed to maintain accurate records, for she has not pointed to evidence that inaccuracies (as defined by the Act) in any record maintained by the FBI proximately caused its decisions to severely discipline, transfer, or fail to promote her or that the defendant acted with the necessary intent. The Court therefore enters summary judgment on the § 552a(g)(1)(C) claim.

### C. Collection of Information

Section 552a(e)(2) of the Privacy Act requires federal agencies that maintain systems of records to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2). The section was designed to " 'discourage the collection of personal information from third party sources and therefore to encourage the accuracy of Federal data gathering.' " *Waters*, 888 F.2d at 874 (quoting *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act*, 120 Cong. Rec. 40,405, 40,407 (1974)). Plaintiff sues under 5 U.S.C. § 552a(g)(1)(D) for damages, requiring her to prove that (1) the agency did not obtain information from her "to the greatest extent practicable," (2) this violation resulted in an adverse effect on her (as opposed to an adverse determination), and (3) the agency's conduct was "intentional or willful." *Id.* at 872.

Courts have not articulated a precise definition of when it becomes "impracticable" to seek information from the subject individual. Two opinions by the D.C. Circuit provide some guidance. In *Waters v. Thornburgh*, like the above-captioned case, the agency was investigating an employee's representations as to his time and attendance. The agency sought information from a third party as to Waters' whereabouts during a period of time on annual leave, then asked Waters to account for his actual use of time. When further investigation did not corroborate plaintiff's representations, his employers became suspicious about whether he had actually taken the bar exam he claimed to have taken during another period of leave. The agency then wrote to the bar examiners instead of asking Waters for proof of attendance at the exam. This conduct was held to violate the Privacy Act because Waters could have provided "satisfactory objective proof" of the issue in question. *Id.* at 874. The fact that the agency had "justifiable grounds for doubting [Waters'] credibility" did not mean that seeking information from him was "impracticable" under the Act. *Id.* at 873.

In contrast, in *Brune v. IRS*, the Court held that an IRS supervisor could contact taxpayers to investigate suspected misconduct related to an agent's visits to them without first interviewing the agent. 861 F.2d 1284, 1287 (D.C.Cir.1988). The *Waters* Court distinguished *Brune* by citing the "special nature of the investigation in that case—possible false statements by an IRS agent" and the concomitant risk that the agent, if contacted first, could coerce the taxpayers to falsify evidence. *Waters*, 888 F.2d at 874. In *Brune*, unlike *Waters*, there was no practicable way for the agency to seek objective proof from the employee.

---

**17.** Even if the e-mail can be considered a "record," plaintiff does not point to a causal link between the e-mail and any particular adverse determination by Parkinson. Thus, the e-mail would still not support plaintiff's claim for damages under subsection (g)(1)(C). *See* Section III(C)(2) *infra*.

The Office of Management and Budget ("OMB") Privacy Act Guidelines promulgated with the Privacy Act also enumerate relevant factors to consider in determining the scope of an agency's subsection (e)(2) obligation, including: the nature of the program; the costs; the risk that third-party information, if inaccurate, could result in an adverse determination; the need to ensure accuracy of the information supplied by the individual; and once the agency has determined it was not practicable to obtain information from the subject, the provisions for verifying the third-party information with the individual. OMB Privacy Act Guidelines, 40 Fed.Reg. 28,948 (July 9, 1975).

Plaintiff claims Woods violated subsection (e)(2) by "secretly" seeking the electronic log of her entry times and by failing to give her adequate time to respond to his questions in July 2000. Plaintiff also claims that Woods should have verified third-party accounts of her whereabouts on the afternoon of April 12, 2001 and her return from Macedonia.[18] (Pl.'s Opp'n at 20–24.) Finally, as above, plaintiff claims that Bowman circulated an e-mail about her based solely on third-party information. She contends that the alleged violations resulted in the initial referral to OPR and influenced Mr. Parkinson, "who was charged with making the final decisions with respect to her career."[19] (Id. at 22.)

### 1. Initial OGC Investigation and OPR Investigation

 With respect to Woods' initial endeavor to compare Velikonja's time sheets with the electronic door logs, defendant argues that the time sheets represented

Velikonja's "sworn statement of the events in question" and Woods was free to verify these representations. (Def.'s Mot. at 38.) Furthermore, the electronic log was not a "third party," as contemplated by Congress. Indeed, seeking records from an electronic door log is very different from asking Velikonja's colleagues, rather than her, about her schedule. The door log provided the most objective source of information about her actual entry times to the building, and unlike the proof of bar exam attendance in *Waters*, the records could not be obtained from plaintiff. Thus, Woods had no legal obligation to seek additional information from Velikonja before accessing the electronic door logs. *See also Hudson v. Reno,* 130 F.3d 1193, 1205 (6th Cir.1997), *abrogated on other grounds by Pollard v. E.I. du Pont de Nemours,* 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (relying on OMB Privacy Act Regulations for the statement that "when conducting an investigation into a particular person, third party sources may be contacted first when practical considerations, such as confirming or denying false statements, require this or when the information can only be obtained by from third parties").

Although plaintiff characterizes Woods' conduct as an "ambush" (*see* Pl.'s Opp'n at 21, 29), it is undisputed that Woods sought additional information directly from Velikonja by meeting with her in July 2000, asking her to correct her time sheets, and asking her to provide him with an explanation for the apparent discrepancies. (Pl.'s Facts at ¶¶ 2–4; Woods Notes; Def.'s Ex. B (Woods Mem. to Velikonja, July 20,

---

18. Velikonja's conduct upon returning from Macedonia became the basis of OGC's second referral to OPR.

19. In consultation with Woods and Bowman, Parkinson made the ultimate decision to

transfer Velikonja out of NSLU. He also decided to change a recommendation letter for a lateral position, which was drafted with a "highly recommended" rating, to a "recommended" rating. (Parkinson St. at 3–4, 6–7.)

2000).) In its own investigation, OPR also considered two statements submitted by plaintiff. (*See* Def.'s Ex. C. (Velikonja St., Feb. 2001); Def.'s Ex. E (Scheira St., Apr. 2003).) Velikonja does not deny that the agency elicited information from her, but merely argues that she did not have enough *time* to prepare her first response to Woods. Thus, she argues, her file was defective when the Inspections Division discovered it and ordered OGC to refer the matter to OPR.[20]

Even accepting the proposition that the Privacy Act mandates not only that agencies "elicit" information from employees but that they must afford them adequate time to prepare a response, Velikonja cannot defeat summary judgment on this claim because she has not raised a genuine issue as to causation. Although her initial response may have been rushed, she had ample time to respond to the allegations against her during the investigation. In denying her appeal on June 6, 2002, the Acting Assistant Director of the Inspection Division wrote, "I have ... considered the issues you raised in your two submissions in opposition to the sanction imposed .... [Y]ou can offer no acceptable justification for deviating from your regularly scheduled Bureau Personnel Management System hours, or for absences from your Unit when you claimed to be on official business." (Pl.'s Ex. BB.) Plaintiff's suggestion that, given more time, she would have been able to create a rebuttal that would have halted the initial referral—when her subsequent explanations failed to sway de-cisionmakers at all—is therefore hardly persuasive. *See also Gergick v. Austin,* 1992 WL 511848, at *19 (W.D.Mo. Aug. 24 1992), ("The right of the employee to present his own case in writing and to refute the conclusions or information provided by others is adequate to meet the requirements of 5 U.S.C. § 552a(e)(2)."), *aff'd,* 997 F.2d 1237 (8th Cir.1993).

### 2. Bowman's E-mail

Plaintiff's argument as to Bowman's e-mail about Velikonja's performance while on duty in the Hague again fails due to a lack of showing of causation. As previously discussed, plaintiff has not linked Bowman's e-mail to an "adverse determination." 5 U.S.C. 552a(g)(1)(C). Nor does she link it to an "adverse effect." 5 U.S.C. 552a(g)(1)(D). Though she claims the e-mail influenced Mr. Parkinson's decisions about her career (*see* Pl.'s Opp'n at 22), she does not dispute that Parkinson referred plaintiff's case to OPR only when instructed to do so by the Inspection Division upon review of Woods' files and does not claim that these files included Bowman's e-mail. Furthermore, there is no evidence that the e-mail (provided in September 2000) was a factor in Parkinson's decision to transfer her out of NSLU or to "recommend" her (instead of "highly recommend[ing]" her) for a lateral position in July 2001. Rather, the record shows that Parkinson relied on the pending OPR investigation and direct reports from Woods in making these decisions. (*See* Parkinson

**20.** Although the referral was not an "adverse action" under Title VII, *see Velikonja I,* 315 F.Supp.2d at 75, the plaintiff faces a lower hurdle in showing an "adverse effect" under the Privacy Act. For example, emotional distress and damage to reputation may satisfy this prong. *See Doe v. Chao,* 306 F.3d 170, 187 (4th Cir.2002) (Michael, J., dissenting), *aff'd,* 540 U.S. 614, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004) ("The majority and I ... also agree that emotional distress can qualify as an adverse effect."); *McCready v. Principi,* 297 F.Supp.2d 178, 194 (D.D.C.2003) (holding that plaintiff's complaints that "her reputation [had] been significantly damaged ... and that she [was] cut off from work assignments commensurate with her grade ... [were] sufficient to constitute an adverse effect").

St.) Bowman's e-mail was apparently in response to Parkinson's request for input on whether to send Velikonja back to the Hague for another assignment (*see* Bowman Dep. at 4–5); it was not a "collection of information" that had anything to do with the injuries alleged in the Complaint.

### 3. Spring 2001 Allegations

 Plaintiff alleges that Woods did not elicit information from her to the greatest extent practicable when he collected information about her time and attendance practices in preparing the July 9 Memo for OPR.[21] (*See* Section III(A)(2) *supra.*) She links this omission to OPR's decision to penalize her as a "repeat offender." (Pl.'s Opp'n at 23.) Unlike his investigation in 2000, Woods never asked plaintiff to explain why he had observed that she had left the office prior to the times she entered on her time sheet on five occasions or why another employee had seen her in the Quantico parking lot at midday of April 12, 2001 and reported that she appeared to be leaving.[22] (Woods Dep. at 47–50, 70–72.) Upon receiving Woods' memo, OPR did not proceed to solicit information from plaintiff as to the alleged aggravating factors. (Her sworn statement submitted to OPR is dated February 15, 2001.)

Although the evidence shows that the Bureau did not seek information from Velikonja directly as to these issues, there is no violation of the Privacy Act unless it was "practicable" for the investigators to contact her directly, 5 U.S.C. § 552a(e)(2), it led to an adverse effect, and the agency's conduct was "intentional or willful." 5 U.S.C. §§ 552a(g)(1)(D), 552a(g)(4).

### a. "Greatest Extent Practicable"

Under *Waters,* the fact that plaintiff was suspected of false statements does not excuse the FBI from seeking information from her directly. *See Dong v. Smithsonian Inst.,* 943 F.Supp. 69 (D.D.C.1996) (finding Privacy Act violation where supervisors did not approach employee about rumor of misconduct for fear of upsetting her), *rev'd on other grounds,* 125 F.3d 877 (D.C.Cir.1997) (ruling that the Smithsonian is not an agency for Privacy Act purposes). The Privacy Act "supports the principle that an individual should, to the greatest extent possible, be in control of information about him which is given to the government ... [This is a] principle designed to insure fairness in information collection which should be instituted whenever possible." *Waters,* 888 F.2d at 875 (internal citation and quotation marks omitted). Other than the explanation in the memo (*see* note 22 *supra*), defendant does not provide any justification for why it would have been "impracticable" for the Bureau to seek a response from plaintiff as it did in 2000. Looking to the OMB factors, there does not appear to be a significant cost to defendant or risk of jeopardizing the investigation as in *Brune.* Furthermore, there was no procedure for verifying the information of third-parties. The Court thus concludes that the FBI did not elicit information from plaintiff "to the greatest extent practicable."

### b. Causality

Under 5 U.S.C. § 552a(g)(1)(D), plaintiff must also show that this failure to comply

---

**21.** Prior to the conclusion of an investigation, OPR generally asks the employee's home division for input as to a number of factors that are used to determine the ultimate penalty imposed on the employee. (*See* Woods Dep. at 35.)

**22.** The memo explains the reason for this omission: "Due to the pending OPR investigation, SSA Velikonja was not questioned in these matters." (OGC July 2001 Mem. at 1312.)

with the Privacy Act actually resulted in an adverse effect. Even assuming the aggravating factors themselves had an adverse effect on the outcome of her disciplinary case, the inquiry must be whether the agency's compliance with subsection (e)(2) would have changed this outcome. If eliciting information directly from Velikonja would not have resulted in a rebuttal that would have been at least minimally persuasive, plaintiff's claim must fail. It follows that the Court must consider whether Velikonja would have been able to provide OPR with evidence that the alleged aggravating factors were in fact not true.

Plaintiff claims that the suggestion that she left the Quantico facility without authorization to take the afternoon off is false. She states that she was merely getting something from her car when the other employee met her in the parking lot and that she spent the rest of the day working in Quantico's library. (*See* Pl.'s Opp'n at 22–23; Velikonja July 2002 St. at 16–17.) She provides no competent evidence, however, to explain her other absences in the late afternoons of April 30, May 3, May 4, May 7, and May 9. She merely asserts in her Opposition (without any record support) that, had the Bureau asked her about the absences, "she could have explained, for example, that she attended a meeting at the Department of Justice, or the White House Conference Center." (Pl.'s Opp'n at 30.) Since these five unexplained absences alone established a record of repeat offenses, and plaintiff has not offered any competent rebuttal evidence, a reasonable fact-finder could not determine that compliance with (e)(2) would have negated or diminished the "adverse effect" of the disciplinary action.

### c. Intent

██ Even if plaintiff could demonstrate causality, she cannot recover damages unless she can show that the (e)(2) violation was "intentional or willful." As discussed in Section III(A)(2), to satisfy this element plaintiff must show that the agency showed "flagrant disregard" for her rights. In fact, the agency's behavior must be so egregious that "anyone undertaking the conduct 'should have known it unlawful.'" *Laningham*, 813 F.2d at 1242 (quoting *Wisdom v. HUD*, 713 F.2d 422, 424–25 (8th Cir.1983)). As the decision not to interview plaintiff about the Spring 2001 incidents appears to have been made by or in consultation with the FBI's General Counsel, Larry Parkinson (*see* OGC July 2001 Mem.), it can hardly be suggested that the agency showed flagrant disregard for her rights. Further, as explained in note 22 *supra*, the agency had a reasonable (although arguably incorrect) rationale for not seeking an explanation from the plaintiff given the pendency of an ongoing investigation. (*Id.*) Thus, plaintiff cannot defeat summary judgment on this claim.

## IV. First Amendment (Count V)

██ Plaintiff claims that her employer took a series of adverse actions against her in retaliation for her vocal advocacy of alternative work schedules and because she accused the agency of gender discrimination in her EEO complaints and other communications within the FBI. (*See* Compl. ¶¶ 62–63; Pl.'s Facts ¶¶ 98–105.)

In *Velikonja I*, the Court held that plaintiff's Title VII claim did not preempt her First Amendment claim because "an adverse employment action taken because of an employee's speech on matters of public concern is independently actionable under the First Amendment." *Velikonja I*, 315 F.Supp.2d at 76. The Court found that "plaintiff's [First Amendment] claim

rests upon alleged retaliation for speech on an issue not related to either her discrimination claim or to protected activities conducted to seek redress for alleged discrimination." *Id.* Defendant correctly argues that only plaintiff's advocacy for flexible hours and other accommodations for agents with children, and not those activities related to her discrimination claim, can form the basis of her First Amendment claim.

To prove this claim, plaintiff must show that her conduct was constitutionally protected, and that it was a "substantial" or "motivating" factor in the government's treatment of her. *Bd. of Cty. Com'rs, Wabaunsee Cty., Kan. v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). If she meets that burden, the government can escape liability by showing that it would have taken the same actions even in the absence of the protected conduct. *See id.* at 674, 116 S.Ct. 2342; *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Plaintiff fails to offer evidence to suggest a link between the government's conduct and her speech activities; thus, the Court need not consider whether her activities were constitutionally protected.

Although she does provide evidence showing that she was actively involved in pursuing better "work-life" programs for FBI employees (*see* Pl's Ex's O, P, and Q), plaintiff fails to offer specific evidence that would link the OPR investigation, the disciplinary action, her transfer to the procurement law unit, or any of the other alleged adverse actions, with her advocacy for this cause. To support her First Amendment claim, she repeatedly asserts that "there was no legitimate reason for

beginning the OPR investigation" and that therefore one can only conclude that the investigation and subsequent adverse actions were retaliatory. (Pl.'s Opp'n at 66; *see also id.* at 60, 62, 67). In doing so, however, plaintiff has ignored the agency's belief that she was violating time and attendance requirements. She has also disregarded *her* burden of showing at least some causal nexus between the speech and the allegedly retaliatory actions.[23] Only then does the burden shift to defendant to show why other legitimate factors would have led it to take the same actions in the absence of any protected activity. *See Umbehr,* 518 U.S. at 675, 116 S.Ct. 2342.

Although plaintiff need not present direct evidence of causation, she must show more than the fact that her employer knew about her activities and that adverse actions occurred sometime subsequent to the speech. *Williams v. Boorstin,* 663 F.2d 109, 114–15 (D.C.Cir.1980) (fact that black Library of Congress employee was discharged after his well-known activism on behalf of black employees did not alone support inference of discrimination, even though court noted his activism might have embarrassed some at the Library). That her speech could conceivably have been a factor in the Bureau's treatment of her is not enough. "What 'could have been' is never alone a sufficient foundation for a finding of what really 'was.'" *Id.* at 115. *See also Alexis v. Dist. of Columbia,* 1999 WL 680384, at *3 (D.D.C. June 15, 1999) (affirming decision to grant summary judgment to defendant where the only evidence plaintiff had offered to show the requisite causal nexus was that she and another employee were terminated less than a year after voicing their opinions on

---

**23.** Plaintiff notes that the causation factor is a "factual question ordinarily left to the jury." (Pl.'s Opp'n at 65.) *See Hall v. Ford,* 856 F.2d 255, 258 (D.C.Cir.1988). While true, this does not relieve plaintiff of her burden to raise a genuine issue of material fact at the summary judgment stage.

matters of public concern). Accordingly, the Court grants summary judgment for defendant on plaintiff's First Amendment claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed with prejudice. A separate Order is attached to this Memorandum Opinion.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this 21st day of December, hereby

**ORDERED** that defendant's motion for summary judgment [# 48] is **GRANTED**; and it is

**FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**

This is a final appealable order.